## WALLACE, administrator, *et al. v.* MIZE.

1. Actions to impose and enforce implied or constructive trusts must generally be brought in seven years from the time such actions accrue.

2. The general rule, that the statute of limitations does not run in favor of a trustee against the cestui que trust, applies only to express trusts; and does not embrace implied or constructive trusts. These latter are within the operation of the statute of limitations, and suits to enforce them may become barred.

3. In this State, when the trustee in an implied trust recognizes the trust and treats it as subsisting within seven years next preceding the institution of an action to enforce it, such suit is not barred by the statute of limitations.

4. When the husband buys land with money which is the separate estate of his wife, and takes the title in his own name, in the absence of any evidence that the wife had given or loaned her money to him the law raises an implied trust in favor of the wife, and makes the husband her trustee holding the property in trust for her sole use and benefit.

5. When timely requested in writing so to do, the court erred in refusing to charge the jury that "all admissions which have been shown to have been made by F. P. Mize must be scanned with care by the jury."

(*a*) While the request is not couched in the exact language of the law, this request is within its sense and spirit.

(*b*) The fact that a request assumes as true a fact which is undisputed furnishes no ground for the refusal thereof, when it contains a principle of law peculiarly applicable and pertinent under the facts of the case.

6. Declarations of one in possession of land, in favor of his own title, are admissible to prove adverse possession.

(*a*) Where a claimant relies upon statements and admissions of his father to show that the latter had purchased land with money of his wife, taking title thereto in his own name, whereby an implied trust arose in favor of the wife, and that in consequence of such a trust the claimant was entitled to an undivided half interest in such land on the death of his mother, he and his father being her sole heirs at law, declarations made by the father, while in possession of the land, that the same was not bought with money of his wife, but with his own funds, are admissible to show his adverse possession.

7. When witnesses are placed under the rule of sequestration, and thereafter a witness remains in court and hears the testimony of other witnesses, this does not disqualify such witness and render him incompetent to testify, but subjects him to attachment and punishment for contempt of court in disobeying its order.

8. Where the rule of the sequestration of witnesses was invoked by the plaintiffs, whose counsel stated that they had no witnesses except their clients, and where the witnesses for the opposite party were then called, sworn, and examined out of the hearing of the other witnesses, the court erred in refusing to permit the plaintiffs to swear a witness

whose knowledge of vital and important facts bearing upon their side of the case had come to the attention of their counsel after the rule above had been invoked, and before the evidence had closed, on the ground that this witness had heard the testimony of the witnesses for the claimant, and because of the above statement of counsel for the plaintiffs at the time the rule was invoked, counsel stating in their place that they had made the above statement in good faith, that knowledge of what this witness would swear to had been acquired by them during the progress of the trial, and that the witness had not been in court since their discovery of what he knew; there being nothing to show that counsel acted in bad faith in the matter.

9. A new trial being granted, this court expresses no opinion on the evidence in the case.

No. 2803. MAY 12, 1922.

Equitable petition. Before Judge Fortson. Banks superior court. August 5, 1921.

R. G. Wallace, as administrator of F. P. Mize, applied to the court of ordinary of Banks county for an order to sell " a tract or parcel of land situated, lying, and being in Bushville district, said county (208th district G. M.), consisting of 108-3/5 acres, more or less, being a part of the place whereon F. P. Mize lived at the time of his death, and being that tract conveyed to F. P. Mize by deed dated November 30, 1883, from W. S. Mize, recorded in deed book C, page 651, in the office of the clerk of the superior court " of said county, to which reference is made for its full description. L. B. Mize thereupon filed his claim to said land, setting up that the same was not the property of the estate of said F. P. Mize, but that he was the owner of a one-half undivided interest in said land. This claim was returned to the superior court of Banks county for trial. Thereupon R. G. Wallace as such administrator, Mrs. F. P. Mize, Mary Mize, Willie Mize, Ruth Mize, Lonnie Mize, and Paul Mize, the latter by their next friend Mrs. F. P. Mize, filed their equitable petition in Banks superior court, in which they alleged: that L. B. Mize was a resident of Clarke county, Georgia; that R. G. Wallace, the administrator of F. P. Mize, was a resident of Banks county; that Wallace was the duly appointed administrator of F. P. Mize, having been appointed such by the ordinary of Banks county; that the estate of F. P. Mize, deceased, consists of 208 acres, more or less, of land in Banks county, Georgia, in Bushville district, known as the F. P. Mize home place; that said administrator had applied for leave to sell the lands of said estate; that before an order was granted for that purpose by

the ordinary of said county, said L. B. Mize, on February 27, 1919, filed a claim to an undivided one-half interest in 108-3/5 acres of said land; that the claim had been transmitted to the superior court of Banks county for trial; that on account of the location of the said land it would be impracticable and detrimental to the interest of said estate to sell the land not included in the claim without selling that included in said claim; that the debts of the estate amounted to the sum of $2500, as shown by a schedule attached to the petition; that the interest on said indebtedness amounts annually to $200, or other large sum, that the buildings on said estate are annually depreciating in value; that the wife and children of said F. P. Mize have had one year's support set apart to them; that they consumed the same in the year for which it was set apart, and they are now in need of support, which they can not obtain on account of the debts due by the estate; that it is necessary to sell said lands, in order that the debts may be paid, and for the purpose of distribution among the heirs; that L. B. Mize is an heir at law of F. P. Mize, and as such would be entitled to a distributive share in his estate; that on account of the present prevailing high prices of real estate, and the present high prices of cotton, it would be to the best interest of said estate that said lands be sold as early as practicable. Petitioners prayed that the court pass an order authorizing said administrator to sell all the 208 acres of land claimed by the estate, including the one-half undivided interest in the 108-3/5 acres claimed by L. B. Mize, that the administrator be required by said order to deposit in the Banks County Bank, or such other bank as the court may select, the amount of money arising from the sale of the undivided one-half interest in said 108-3/5 acres, subject to the final decision of the court on the claim filed by L. B. Mize. They prayed for such other relief as was meet and proper.

Hon. Andrew J. Cobb, judge of the Western judicial circuit, passed a consent order, authorizing and directing the administrator to sell said land, his deeds to vest as good title in the purchaser as if no claim had been filed, that one half of the proceeds of the 108-3/5 acres stand in the place of the land, and be kept subject to the future orders of the court, to be disposed of by the final judgment in the claim case.

L. B. Mize answered the petition, admitting the substantial al-

legations thereof. He alleged that the 108-3/5 acres of land belonged to F. P. Mize and himself jointly, and the other 100 acres belonged to F. P. Mize; that he was an heir at law of F. P. Mize, and as such entitled to receive his share of the estate; that the 108-3/5 acres of land was purchased with the money which his mother inherited from her father's estate; that while the title to said 108-3/5 acres was taken in the name of F. P. Mize, the land did, as a matter of fact, belong to the wife of F. P. Mize, deceased, who was his mother; and that on the death of his mother she left surviving her husband and himself, her only child, as her sole heirs at law, and as such he was entitled to one half of said land.

This consolidated case came on for trial at the March term, 1921, in Banks superior court. On the trial it was admitted that the 108-3/5 acres brought, when sold, $5220.40; and that L. B. Mize would be entitled to one half thereof, if his claim to a half interest in said land was sustained.

Mrs. M. T. Anthony, for claimant, testified that she knew F. P. Mize during his life; knew his first wife, who was an Erskin. Was there when the first Mrs. Mize was sick. She had been very low, but had gotten up and was able to knock around in the house. F. P. Mize at that time was living there on that place where he finally died. It was between 25 and 28 years ago. I was there when there was a conversation between the first Mrs. Mize and her husband, F. P. Mize, about this piece of property. She said, " Martha, I don't believe I am going to live long. I am going to tell you, in the presence of Bud, I want Luther to have half of my individual property, and I want Bud to have the other half as long as he lives; and if Luther outlives his father I want Luther to have it." Bud was her husband. The property she spoke of was the land she said her money was in, where she was living. That was where they were living when she was talking to me. In that conversation F. P. Mize, or Bud Mize, told her he thought she was right in dividing it up as she said. He said, " Sue, I think you are right in dividing it up like you are." Mrs. Sue Mize's money paid for the land. She lived but a year or probably two years after. In that conversation she said the money came from her father that went into that land. She said her money went into the land right where they were living. She said, " Martha, my money went to pay for this land, here." He owned and had possession of more

land besides the 108-3/5 acres. Knew Luther Mize. I recall he was somewhere about twenty years old at the time. F. P. Mize died four years ago, I recall.

Mrs. S. E. Mize, for claimant, testified: Am F. P. Mize's sister in law. Luther Mize is my nephew. My husband and F. P. Mize were brothers. My husband had a tract on this side, and adjoined this land. M. C. Mize was my husband. F. P. Mize's first wife was Sue. The last time I was there I said, " Why don't you get some chairs ? " She said, " I have not got the money. All my money has gone on this farm, and I have not got a penny to buy them with." She said her money went into the farm, and her husband was sitting there. Many a time she spoke of it when I was there, and said it was her place, and she wanted Luther to have half of it, and Bud the other half, but if Bud died first she wanted Luther to have it all. Did not exactly hear Bud Mize make any remark about whose money paid for that land. But it was right there altogether. We were sitting in the room, and she told me her money had gone to pay for that land. Bud Mize was there, turned around and just smiled. When Mrs. Sue Mize was talking about how the farm was paid for, she said the money came from her father's estate, Mr. Erskin. Think she said between four and five hundred dollars, or about four hundred dollars, may be a little more. The place cost three hundred and twenty-five dollars, I think. This conversation was in 1882. Bud Mize did not have any property along about then at all. They were married when I moved there, but they had no property, because that piece of land was divided between the brothers, and neither one had paid a penny on it, only what Bud had gotten from Sue; and Mr. Mize never paid a penny on his, because the man was not making anything. My husband did not pay a penny on his. He lost his. That strip of land was bought from old Grandpa Mize. His father bought the land and divided it between the two brothers, and Bud took on that side. My husband did not pay for his. Bud paid for his. Did not see it paid. I know he did pay for it. I know of my own knowledge that Sue paid for that land.

Mrs. Luther Mize, for claimant, testified: Am Luther Mize's wife. His father has been dead four years. Heard a conversation between F. P. Mize and my husband about the 108 acres of land in this county. About 1915 Mr. Mize came down to our house one

Saturday afternoon and stayed until Monday morning. He and my husband talked a whole lot about this business. He said he wanted to settle with him on this Erskin money, but he said, " I am not in financial shape to do anything like that"— it would tear him all to pieces if my husband demanded it and pushed on him for a settlement right then. He said, " If you will wait on me, probably I can do that later, and I will settle with you for this money." He said, " I know that your mother and you are the only heirs to this Erskin money that went into this 108 acres of land." He said that that night or the afternoon he was down there. The 108 acres of land was the home place. Heard him talk numbers of times about the home place. That was where he lived at the time of his death. They bought more land. Think they really bought more before me and Luther were married, and added to this 108 acres. Mr. Mize said, " If you cut this 108 acres up " the way Sue said for him to do it, it would tear his home place all to pieces. He said he was in bad shape and could not do that right then, and said, " I don't want you to push on me right now for a settlement, for it will certainly tear me up." He said Sue always requested of him that she wanted Luther to have this home place. Said it was her money in this, and said she always requested it of him. F. P. Mize lived on this place when we were married, and he lived there until his death. Luther did not live there after we were married. He did not cultivate any part of it. He did not have any tenant on any part of this land. After he married, F. P. Mize cultivated it, and he said all the time he was going to settle with Luther, because Luther had this Erskin money in this 108 acres of land. But he said financially right then he was not able to do it. Heard him tell Luther that in 1915. Occasionally they would get to talking about it, and he would say he was going to balance this thing. Heard him talk about it soon after we were married. He said all the while he aimed to give Luther his part of it, because that was the request of his wife, because Luther was the only heir and she wanted this child to have his part of her estate.

Warren Wilson, for claimant, testified: Knew Bud Mize in his lifetime. Was his brother-in-law. His first wife's name was Susan Erskin. Her father was James Erskin. Bud Dyer administered on James Erskin's estate. Knew where Bud Mize and his wife lived about 1881, '82, or '83, along there. He lived at the

place they bought there after they were married. They lived at the Erskin place before with the old man, a little place near there, and then moved to the place they bought. They bought something like one hundred acres. William Mize was not the husband of Mrs. S. E. Mize. He was Bud Mize's father. Bud Mize lived on the place he bought until his death. My wife's and his wife's father's estate was wound up about 1880, somewhere along there. It has been something like forty years. Each one of the heirs received from that estate about four or five hundred dollars. I know what was done with the money of Mrs. Sue Mize. They bought some land there, the land you were speaking about. Bud Mize had one child by his first wife; that was Luther, the claimant in this case. Don't think along about the time they bought this tract of land Bud Mize had any money or property of his own. He was young. — Cross-examination: Bud Mize along there then was about twenty-two or twenty-three, when he married. He married his first wife, somewhere along about '79 or '80. He was an able-bodied, stout man. He was raised to work. He was a farmer and lived there with his father. He raised crops, I suppose. I can say he didn't have any means. He got something for his labor during those years. He hadn't labored much for himself. They didn't make a great deal, all of them; very poor folks. I testified that that land was bought with his wife's money. I only know that from circumstances. Couldn't swear to it. That is a conclusion of mine from the circumstances. Can't say of my own knowledge that her money paid for the land. They began to live on this land about 1882 or 1883. Mr. Bud Mize lived on then until his death. He cultivated it. Luther Mize is near forty years old, not far from that. Before they bought this land Bud Mize had been working and cultivating the land for a number of years. Don't know how much he made from his work and crops, but he did not make a great deal. He had no help at the time, only had a horse, and they worked like everybody else starting out, and did not have much to start with.

W. J. Smallwood, for claimant, testified: In 1910, as well as I remember, I lived on Bud Mize's land. Heard a conversation between Bud Mize and Luther Mize. Luther asked Mr. Mize about a settlement of some money he had some way or another in the place, and he asked him could he pay him what he owed, and he

told him, no he could not; and Luther said to Mr. Mize, " I am obliged to have my money," and went on back home. Mr. Mize was scared Luther was going to sue him, and he asked me to go over and see Luther and see if I could not get.him not to do anything of the kind. I told Luther about it. He told me to tell him he was not able to pay it, and if he paid it he would have to borrow the money and pay it. Luther said, " If Pa is too poor to pay the money, I will let him alone." Went back and reported the conversation to Mize. Mr Mize said, " Luther has this money in this place," and. my recollection is that it was four or five hundred dollars in the place. He said, " If Luther will treat me that way, I will try to get the money up as·quickly as I can." Bud Mize was in possession of this land at the time. I rented the land from him and tended a crop on that place. I suppose I had known the land before that something like twenty or twenty-five years. All that time Bud Mize was in possession of it and cultivating what he did not have rented out. I said Luther Mize wanted Bud Mize to pay him what his mother had in the place. I suppose he wanted that paid in money. He did not say exactly, but he wanted a settlement, and Bud Mize was afraid he would sue him; and he sent word by me to Luther to persuade him not to do anything, that he was not able to pay him at that time. Luther lived three quarters or a mile from Bud Mize's place. He bought a little place over there a mile or three quarters of a mile from Mr. Mize's.

Defendant and claimant introduced voucher No. 5, in annual-return book No. 3, page 538, of the ordinary's records, as follows: " Received of R. J. Dyer, administrator of James Erskin, deceased, $50.00, as a part of my distributive share in said estate. Dated January 23, 1880. [Signed] F. P. Mize." Also, voucher No. 4, in annual-return book No. 4, page 177, ordinary's records, as follows: " Received· of R. J. Dyer, administrator of James Erskin, deceased, $60.00, in part of my share as legatee. This November 2, 1880. [Signed] F. P. Mize." Also, voucher No. 11, on page 178 of the same book, reads as follows: " Received of R. J. Dyer, administrator of James Erskin, deceased, $45.00, as a part of my distributive share in the estate of James Erskin deceased. Dated March 24, 1881. [Signed] F. P. Mize." Also, voucher No. 12, as follows: " Received of R. J. Dyer, administrator of James Erskin; deceased, $30.00, as a part of my distributive share in said

estate. This April 14, 1881. [Signed] F. P. Mize," Also, voucher No. 13, "Received of R. J. Dyer, administrator of James Erskin, deceased, $30.00, the same being part of my distributive share as legatee. This January 7, 1881. [Signed] F. P. Mize." Also, voucher No. 14, "Received of R. J. Dyer, administrator of James Erskin, deceased, $31.00, the same being part of my distributive share in said estate. This Nov. 1, 1881. [Signed] F. P. Mize." Also, voucher No. 5, on page 325 of the same book, as follows: "Received of R. J. Dyer, administrator of James Erskin, deceased, $93.50, as a part of my distributive share in said estate as a legatee. This May 1, 1883. [Signed] F. P. Mize." A portion of the annual return of R. J. Dyer, administrator, found in annual-return book 5, page 569, in the ordinary's office of said county, showing the total distributive share of each legatee to be $456.63; and deed from W. J. Mize to F. P. Mize, dated November 30, 1883, consideration $373, wherein the grantor conveys to the grantee all that tract or parcel of land situated, lying, and being in the county of Banks on the waters of Hudson river, adjoining the lands of Thomas Mize, Cape Oliver, and others, containing 108-3/5 acres, more or less. This deed was recorded December 3, 1883.

Mrs. F. P. Mize testified for the plaintiffs: Am the wife of F. P. Mize. We were married in 1901. Know the 108 acres of land described in deed from W. J. Mize to F. P. Mize. My husband died last January four years ago. From the time we were married until he died we lived on those 108 acres, there at the old home. He controlled the land. He had hands working on it. During the time he was in possession he said he owned it. I have five children by F. P. Mize, Mary 17, Willie 14, Ruth 12, Louise 10, and Paul 8.

R. G. Wallace testified for plaintiffs: Am the administrator of F. P. Mize. He died in 1917. I know Luther Mize. He is somewhere near forty years old.

F. M. Sanders testified for plaintiffs: Mr. Luther Mize lives somewhere near Athens. Know where he lived before he moved to Athens, in this county. I did know how he got the place, but don't remember now.

The jury returned a verdict in favor of the claimant. The plaintiffs moved for a new trial, on the general grounds, which was amended at the hearing. The court overruled the motion for new trial, and this is the error assigned.

*G. P. Martin* and *H. H. Perry,* for plaintiffs.

*Erwin, Erwin & Nix* and *W. W. Stark,* for defendant.

HINES, J. (After stating the foregoing facts.)

1. What statute of limitations is applicable to actions to impose and enforce implied trusts ? By analogy to the doctrine that actions for the recovery of land can be defeated by prescriptive title, acquired by possession for seven years under color of title, actions to enforce implied trusts must be brought within seven years from the time the actions accrue. *Freeman* v. *Cooper,* 14 *Ga.* 238; *Cade* v. *Burton,* 35 *Ga.* 280; *Knox* v. *Yow,* 91 *Ga.* 367, 376 (17 S. E. 654); *McWhorter* v. *Cheney,* 121 *Ga.* 541, 547 (49 S. E. 603); *Pierce* v. *Middle Ga. Land &c. Co.,* 131 *Ga.* 99, 103 (61 S. E. 1114); *Basch* v. *Frankenstein,* 134 *Ga.* 518, 522 (68 S. E. 75); *Beasley* v. *Smith,* 144 *Ga.* 377, 381 (87 S. E. 293). While not all of these cases deal with the statute of limitations applicable to suits to impose implied trusts, the principle of these decisions covers the cases of implied trusts. In *Basch* v. *Frankenstein,* supra, which involved an implied trust, this court treated the period of seven years as the proper bar to such actions. So we are of the opinion that actions to impose and enforce implied trusts must be brought in seven years.

2. The general rule, that the statute of limitations does not run in favor of a trustee against the cestui que trust, applies only to express trusts; and does not embrace implied or constructive trusts. These latter are within the operation of the statute of limitations, and suits to enforce them may become barred. *Thomas* v. *Brinsfield,* 7 *Ga.* 154; 25 Cyc. 1155.

3. This rule is subject to qualification and exception. Even though the trust sought to be enforced is not an express trust, yet if it is solely within the jurisdiction of a court of equity, and is recognized and acknowledged by the person chargeable as trustee, it is not subject to the operation of the statute until it is repudiated by the trustee. 25 Cyc. 1158 (B). Implied trusts are solely within the jurisdiction of a court of equity, and in dealing with them this court has so treated them, thus bringing them within the above qualification and exception. In this State, when the trustee in an implied trust recognizes the trust, and treats it as subsisting within seven years next preceding the institution of an action to enforce it, such suit is not barred by the statute of limitations.

*Garner* v. *Lankford,* 147 *Ga.* 235 (93 S. E. 411); *McDowell* v. *Donalson,* 149 *Ga.* 600 (101 S. E. 578); *Hawkins* v. *Hawkins,* 150 *Ga.* 61 (102 S. E. 431).

4.  When the husband buys land with money which is the separate estate of his wife, and takes the title in his own name, in the absence of any evidence that the wife had given or loaned her money to him, the law raises an implied trust in favor of the wife, and makes the husband her trustee holding the property in trust for the use and benefit of his wife.  *Garner* v. *Lankford, McDowell* v. *Donalson, Hawkins* v. *Hawkins,* supra; *Oliver* v. *Hammond,* 85 *Ga.* 323, 331 (11 S. E. 655); *Teasley* v. *Bradley,* 110 *Ga.* 497 (35 S. E. 782, 78 Am. St. R. 113); *Rucker* v. *Maddox,* 114 *Ga.* 899 (41 S. E. 68); *Barber* .v. *Barber,* 125 *Ga.* 226 (53 S. E. 1017). There is some evidence tending to show that F. P. Mize, on November 30, 1883, invested money of his first wife, who was the mother of the claimant, in the land in dispute; that the husband during the lifetime of the wife recognized and acknowledged the trust thus raised and implied; and that after the death of the wife, and up to a period within much less time than seven years prior to the time the son filed his claim to an undivided half interest in this land, the father recognized the claim of the son to such interest and share in this land.  Under these circumstances it became an issue of fact, to be determined by the jury, whether the husband bought this land with money of his wife, and whether, after her death, he recognized and acknowledged the trust, and treated the son as entitled to an undivided half interest in this land.  As a new trial is granted, we shall not deal with the sufficiency of the evidence to establish either of these propositions.

5.  In the fourth ground of the motion for new trial the plaintiffs complain that the court erred, when timely requested in writing so to do, in refusing to charge the jury as follows:  " All admissions which have been shown to have been made by F. P. Mize must be scanned with care by the jury."  The law is that " all admissions must be scanned with care."  Civil Code, § 5784. While not in the exact language of the code, this request was within the sense and spirit of the law.  *Ocean Steamship Co.* v. *McAlpin,* 69 *Ga.* 437 (4).  This principle was peculiarly pertinent and applicable to the issue involved in this case.  The statements and admissions relied upon by the claimant " were the verbal declarations

of a deceased person, deeply affecting his estate;" and the admonition contained in this request should have been given to the jury. Counsel for the claimant insists that this request was properly refused, because it assumed or intimated that admissions against his interest had been made by F. P. Mize, and that for this reason the court did right in refusing to give the instruction. It is true that it is never error for the court to refuse to give a written request in charge to the jury which, if given, would contain an intimation of opinion by the court upon an issue of fact in the case. *Mitchell* v. *Crummey,* 134 *Ga.* 383 (2) (67 S. E. 1042) ; *Insurance Co.* v. *Leader,* 121 *Ga.* 260 (5) (48 S. E. 972). Where a fact is undisputed, the court may so tell the jury, and such instruction would not be erroneous. *East. Tenn., Va. & Ga. Ry. Co.* v. *Markens,* 88 *Ga.* 60, 62 (13 S. E. 855, 14 L. R. A. 281) ; *Southern Ry. Co.* v. *Chitwood,* 119 *Ga.* 28 (45 S. E. 706) ; *Greer* v. *Rancy,* 120 *Ga.* 290 (47 S. E. 939). The claimant relies upon alleged statements and admissions of F. P. Mize to make out his case; and there was no evidence on the part of the plaintiffs directly contradicting the making of such statements and admissions. In view of this state of the evidence, the court could give a written request to charge in which the proof of the making, but not the truth, of such statements and admissions is assumed. In view of the importance of an instruction upon this subject, where the estate of a deceased person depends upon his alleged statements and admissions, which were beyond the power of the plaintiffs to disprove, because the maker was dead, and there were no other persons present except the witnesses testifying to such statements or admissions, a new trial should be granted in this case.

6. In the fifth ground of the motion it was alleged that the court erred in refusing to permit Mrs. F. P. Mize to testify that " Mr. Mize, while in possession of the land, stated to witness that not a penny of his wife's money ever went into this land, and that he paid for it himself." The claimant introduced evidence tending to show that the deceased, while in possession of the land in dispute, had made statements and admissions by which he recognized and acknowledged the existence of the implied trust hereinbefore dealt with, to the effect that he held possession of the land in dispute under such trust, for the use and benefit of his deceased wife, and after her death for their only child. A vital issue in this case

was the character of the possession of the deceased. Did he hold as trustee for his son under an' implied trust, or did he hold adversely to his son ? Declarations of a person in possession of land, in favor of his own title, are admissible to prove his adverse possession. Civil Code, § 5767. " Where A claimed under a verbal gift from B to his son, which it was sought to prove, by declarations of B, was made at some period previous to the declarations and where it was also shown that the property continued in the possession of B: *Held,* that other sayings, inconsistent with such a gift by B, at other times, made while he continued in possession, were admissible as evidence for the opposite party." *Hansell* v. *Bryan,* 19 *Ga.* 167 (2) ; *Bowman* v. *Owens,* 133 *Ga.* 49 (65 S. E. 156) ; *Rucker* v. *Rucker,* 136 *Ga.* 830 (72 S. E. 241).

" Declarations of one in possession of land, that the land is his, are admissible to show adverse possession, but not for any other purpose." *Harrison* v. *Hatcher,* 44 *Ga.* 638 (4), 643; *Dawson* v. *Callaway,* 18 *Ga.* 573 (4). " The declarations of a party in possession in favor of his own title are admissible to prove adverse possession." *Huggins* v. *Huggins,* 71 *Ga.* 66.

The claimant in this case relied on admissions of his father, whose mouth was closed by death, to establish the implied trust which he sought to enforce. Under these circumstances, declarations of the father, explaining the character of his possession, and to that extent rebutting the theory of the claimant, should have been admitted, while favorable to the father. *Banks* v. *Bradwell,* 140 *Ga.* 640, 644 (79 S. E. 572). Where one is shown to have been in possession of land, declarations made by him while his possession was continuing, to the effect that he was the owner of the land, are admissible to show the adverse character of his possession. *Copeland* v. *Jordan,* 147 *Ga.* 601 (95 S. E. 13). So we are of the opinion that the court erred in refusing to permit the plaintiffs to prove the declaration of the intestate, while in possession of the land in dispute, " that not a penny of his wife's money ever went into his land, and that he had paid for it himself," the objection to this evidence being that it was a self-serving declaration. · This testimony was competent to explain the character of the possession of the declarant. This ruling does not conflict with the cases which hold that such declarations are not competent to establish ownership. *Dozier·* v. *McWhorter,* 117 *Ga.* 786 (45

S. E. 61). And to prove a gift. *Rucker* v. *Rucker,* supra. In the case at bar the title and ownership of F. P. Mize were shown by his deed. The only issues involved were, first, whether his first wife's money had gone into this land; and secondly whether he held adversely to the claimant. This evidence clearly shed light upon the character of his possession. If he paid for this land with his own funds, and took the deed in his own name, it might be inferred that he held adversely to the claimant.

7, 8. In the sixth ground of their motion for new trial the plaintiffs complain that the court erred in refusing to permit Joe Mize, a witness offered by them, to testify in their behalf. Counsel for the plaintiffs stated to the court, that they expected to prove by this witness " that this land in dispute was not paid for except with same money that Bud Mize (F. P. Mize) obtained from his father's estate, and that it was not paid for until after the deed, and it was paid for out of his distributive share· of his father's estate." The court excluded this witness on the ground that counsel for the plaintiffs, at the opening of the case, had invoked the rule for the sequestration of the witnesses, when counsel for the claimant had sent their witnesses out, and when counsel for the plaintiffs stated that they had no witness except the parties. This witness had been in court and heard a part of the testimony of the other witnesses. Mr. Perry, of counsel for the plaintiffs, when he called this witness, stated they did not know of any evidence which they could introduce from this witness, until after the other witnesses were examined, but they understood he was in court part of the time. Thereupon counsel for the claimant made the objection to this witness testifying. Counsel for the plaintiffs said that they made the statement that they had no witnesses except the parties, in good faith. Mr. Perry stated in his place that he did not know that he could make the above proof by this witness until the dinner hour; and that he proposed to show by the administrator, Mr. Martin, his associate counsel, and Mrs. Mize, that neither one of them knew, at the time the rule of sequestration was invoked, that this witness knew the above facts. Mr. Martin testified that he did not know that this witness would give this testimony, and did not learn that he would until yesterday afternoon, after they started to leave, and had gone down the road in an automobile. He did not know he was in the court-room here this

morning, but did know he was in the court-room yesterday afternoon. Judge Stark, of counsel for the claimant, stated that Mr. Mize was in this case, was called, and " has been sitting right here." Had a conference at Commerce the other day, and Mize was down there, up in Martin's office where the conference was held looking to a settlement of this matter, in the presence of Perry and himself. He was there in the presence of Mrs. Mize. He " was here yesterday morning and sitting right there." Mr. Martin stated that this witness came into his office at the conference at Commerce, asked if Luther Mize was in, and stayed a few minutes. He had no conversation with this witness. They did not invite him. On this showing the court sustained the objection of counsel for claimant to this witness testifying, and refused to permit him to testify in behalf of the plaintiff.

Where the sequestration of the witnesses has been ordered by the court, and in violation of the court's order a witness remains in court and hears the testimony of the other witnesses, this does not disqualify the witness, and render him incompetent. It may subject the witness to attachment and punishment for contempt. *Rooks* v. *State,* 65 *Ga.* 330; *Lassiter* v. *State,* 67 *Ga.* 739; *Bone* v. *State,* 86 *Ga.* 108 (12 S. E. 205); *Metropolitan St. R. Co.* v. *Johnson,* 90 *Ga.* 500 (16 S. E. 49); *May* v. *State,* 90 *Ga.* 793, 800 (17 S. E. 108); *Cunningham* v. *State,* 97 *Ga.* 214 (22 S. E. 954); *McWhorter* v. *State,* 118 *Ga.* 55 (6) (44 S. E. 873); *Davis* v. *State,* 120 *Ga.* 843 (2) (48 S. E. 305); *Phillips* v. *State,* 121 *Ga.* 358 (49 S. E. 290); *Taylor* v. *State,* 132 *Ga.* 235 (63 S. E. 1116); *Withrow* v. *State,* 136 *Ga.* 337 (6) (71 S. E. 139).

In *Etheridge* v. *Hobbs,* 77 *Ga.* 531 (3 S. E. 251), the witnesses were sworn and put under rule, but one of them remained in the court-room, and heard what transpired throughout the trial. After the testimony had closed, the plaintiffs offered to prove by such witness facts which were contested by the defendants. This court held, that there was no abuse of discretion in refusing to allow him to testify. The fact that the evidence had closed distinguishes this case from the instant case, and the decisions of this court above cited. Counsel for the claimant relies on *Pergason* v. *Etcherson,* 91 *Ga.* 785 (18 S. E. 29). There the witness stated he had been assured by counsel that he would not be introduced. His statement was confirmed by counsel, accepted by the court,

and the witness was thereupon discharged from the proceeding for contempt. Afterwards counsel applied to the court to introduce and examine this witness, on the ground that he was mistaken in thinking that the witness would not be sworn and examined. The court refused to permit the witness to be sworn. In that case counsel for one of the parties had stated to the witness that he would not be sworn, and in consequence the witness disobeyed the order of the court. This court held, that, "under the peculiar circumstances of this case, we will not control the discretion of the court below in refusing to allow the witness to testify." "There the conduct of the counsel amounted to a voluntary waiver of their right to introduce the witness who had disobeyed the court's order, and by means of such waiver they had procured the discharge of the witness from the rule for contempt. After having thus waived the right to introduce the witness under the circumstances, this court would not compel the trial judge to allow the waiver to be recalled and the witness examined." *Cunningham* v. *State,* supra.

In the case at bar the facts are very different. Here counsel did not know that the witness knew of the facts sought to be proved by him, until after the rule had been invoked, and the case had progressed for some time. On the afternoon of the day when the trial commenced, and presumably after the adjournment of the court for the day, one of the counsel for the plaintiffs, in a talk with this witness, discovered that he would testify to the facts set out above. The testimony next morning was introduced before this counsel returned. Mr. Perry did not know that he could make this proof by this witness until the dinner hour. There is no proof that this witness was in court, with the knowledge of the plaintiffs or their counsel, after it was discovered that he knew facts vital to the case of the plaintiffs. In view of the overwhelming importance of this proof to the cause of the plaintiffs, and in view of the fact that F. P. Mize was dead, we think the court erred in refusing to let this witness be examined.

*Judgment reversed. All the Justices concur.*