1. Under the uniform-procedure act of 1887 (Code, § 37-901), permitting both legal and equitable rights and remedies to be adjusted in a single superior-court suit, a petition seeking both legal relief and ordinary relief in equity is not subject to general demurrer on the ground only that the plaintiff has a complete and adequate remedy at law. Sullivan v. Ginsberg, 180 Ga. 840, 847 (181 S.E. 163); DeLacy v. Hurst, 83 Ga. 223 (4-6) (9 S.E. 1052). If a petition sounding in equity sets forth a cause of action at law, it will not be dismissed for a lack of equity. If the suit is good at law, it is immaterial how it is labeled. Where a plaintiff alleges and proves such facts as entitle him to equitable relief, the court will enforce his equitable rights; but where, although he asks equitable relief, he alleges and proves only such facts as entitle him to strict legal rights, the court will enforce his legal rights, but only according to the strict rules of law. Such a case will be dealt with and controlled by the same legal principles which would have been applied had it been instituted as a suit at law. Grimmett v. Barnwell, 184 Ga. 461, 463 (192 S.E. 191), and cit. Under this rule, the ground of general demurrer to the instant petition, that it "fails to state a cause of action," would not authorize a dismissal of the entire suit, even if such a ground were sufficient to raise the question that there is an adequate remedy at law. Since the petition seeks relief good at law, it would stand as a suit at law, even if the prayers for equitable relief were to be held bad as such.
2. While a mere prayer for an accounting in an action seeking damages for a tort, and based upon no trust or fiduciary relation, will not make a petition one in equity (Burruss v. Montgomery, 148 Ga. 548, 97 S.E. 538, and cit.; Gormley
v. Slicer, 178 Ga. 85, 172 S.E. 21, and cit.; Universal Garage Co. v. Fowler, 184 Ga. 604, 192 S.E. 299; Clarke v. Upchurch, 31 Ga. App. 601, 121 S.E. 525; Code, § 10-102), it is nevertheless true that where the petition seeks to establish and enforce a trust, or "where a fiduciary relation exists, an accounting in equity is proper." Atlanta Trust Co. v. National Bondholders Cor., 188 Ga. 761, 767 (4 S.E.2d 644); *Page 154 Ausley v. Cummings, 145 Ga. 750 (7), 758 (89 S.E. 1071).
(a) "Trusts are implied . . where, from any fraud, one person obtains the title to property which rightly belongs to another." Code, § 108-106 (2). "Constructive trusts are such as are raised by equity in respect of property which has been acquired by fraud, or where, though acquired originally without fraud, it is against equity that it should be retained by him who holds it." O'Neal v. O'Neal, 176 Ga. 418 (2) (168 S.E. 262), quoting 26 R. C. L. 1232, § 78; Jenkins v. Lane, 154 Ga. 454 (4), 477, 478 (115 S.E. 126), and cit.; Frick Co. v. Taylor, 94 Ga. 683
(21 S.E. 713). "Trusts are children of equity. . . A court of law may entertain them; but when the case is complicated, especially when it has a flavor of fraud, equity will not banish them, and remit the parties to another forum." Kupferman v. McGehee, 63 Ga. 250 (4), 256; 63 C. J. 1015, § 943. As against a trustee ex maleficio, the person injured is entitled to recover or subject in equity the property and its income or product to such a trust; and if the trust property can not be traced, the fact that an action might have been brought at law for damages, or that the plaintiff may in his suit to establish the trust also seek a money judgment for the proceeds of the trust property, if the property can not be traced, will not divest equity of jurisdiction. Salzberger Bank v. Standard Oil Co., 173 Ga. 722 (161 S.E. 584); Castleberry v. Wells, 183 Ga. 328 (3), 335 (188 S.E. 349), and cit.; Stoneeypher
v. Coleman, 161 Ga. 403 (1, a), 408, 410 (131 S.E. 75); O'Neal v. O'Neal, supra; Robison v. Carey, 8 Ga. 527, 530; Brown v. Father Divine, 173 Misc. 1029
(18 N.Y. Supp.2d 544 (3-5), 546.
(b) The petition alleged that the defendant, by fraudulent representations of himself and his agent, obtained the plaintiffs' valuable stocks and United States bonds worth $11,898, by exchanging therefore certain worthless stock and certain bonds worth $6,270; and that two other persons, conspiring with the defendant, by fraudulent representations later obtained from the plaintiffs the bonds which the plaintiffs had received from the defendant, through a swap of entirely worthless stock for such bonds, and sold the bonds which the alleged conspirators thus obtained to the defendant or other purchasers procured by him. Under the foregoing rules, the averments of the petition sufficiently alleged an equitable cause of action for establishment and enforcement of a constructive trust, and for an accounting as to the trust property and its proceeds and "the income therefrom if said stocks and bonds could be traced," with an alternative prayer for recovery of the proceeds of sale, equal at least to their market value at the time of sale, if the property could not be traced.
3. As to a tender, it was alleged that before suit the plaintiffs had formally tendered to defendant all money and the worthless stock received in exchange for their own stocks and bonds: that defendant refused the tender and denied any liability: and that plaintiffs "continually tender to the defendant said stock certificates . . and said [money], and state they are agreeable that any decree or judgment . . against the defendant be conditional upon said payment and transfer by petitioners or offset in an amount equal to said [money] and the transfer of said stock certificates or any other sums or property which the court *Page 155 
may find due by petitioners to defendant." These averments of tender and an offer to do equity, under the Code, §§ 37-104, 20-906, were sufficient, without a continued legal tender or a delivery into court of any money and stocks received from the defendant in the alleged fraudulent exchange, such as might have been necessary from a defendant sued for recovery of money or stock. Especially is this true where it was further alleged that defendant had possession of plaintiffs' property as to which it was sought to impose the trust; that the money received by plaintiffs, with the worthless stock, was less than ten per cent. of the value of their own stocks and bonds; and where plaintiffs prayed an accounting as to the alleged unknown income and proceeds received by the defendant from their property. See Zugar v. Scarborough, 186 Ga. 310, 321 (197 S.E. 854); County of Bibb v. Winslett, 191 Ga. 860
(14 S.E.2d 108); Wynne v. Fisher, 156 Ga. 656 (2) (119 S.E. 605) Mayer v. Waterman, 150 Ga. 613 (3), 617 (104 S.E. 497); Franklin v. Cruce, 187 Ga. 58 (2) (200 S.E. 135), and cit.; Fricker v. Americus Improvement Co., 124 Ga. 165 (5), 172 (52 S.E. 65); Pope v. Thompson, 157 Ga. 891 (2), 895 (122 S.E. 604); Kerr v. Hammond, 97 Ga. 567, 570 (25 S.E. 337); Irwin v. Askew, 74 Ga. 581
(4), 586; Johnson v. Giles, 69 Ga. 652, 655. After setting forth a first alleged fraudulent exchange of worthless stock and bonds of a stated value, by which the defendant obtained from the plaintiffs their valuable stocks and United States bonds of much greater value than the bonds of the defendant, as indicated in the preceding parts of this syllabus, the petition alleged that, about eight months later, the defendant and two other persons conspired to repossess, and the alleged conspirators by fraudulent misrepresentations repossessed, the bonds which the plaintiffs had previously received from the defendant, and sold such bonds to the defendant or other persons procured by him. Under these averments, the contention that the plaintiffs should have tendered to the defendant the bonds which had already been repossessed and disposed of as alleged, or their value, is manifestly without merit.
4. A general demurrer does not raise questions as to multifariousness, duplicity, or misjoinder of causes of action, or as to nonjoinder or misjoinder of parties. As to such matters, a special demurrer is necessary. Tingle v. Maddox, 186 Ga. 757 (198 S.E. 722; Shingler v. Shingler, 184 Ga. 671, 672 (192 S.E. 824); Wilkinson v. Smith, 179 Ga. 50, (176 S.E. 373); Burkhalter v. Peoples Bank, 175 Ga. 744 (3) (165 S.E. 749). Since the only special demurrer raising any of these questions attacks merely the alleged misjoinder of causes of action as to paragraph 78 of the petition, referred to in the preceding division, only the question of misjoinder thus raised can be considered. Where several matters are stated in a petition, not as distinct and unconnected. but as arising "out of the same transaction or series of transactions, forming one course of dealing, all tending to a single end," a demurrer for misjoinder of causes of action will not lie. Griggs v.
Griggs, 218 N.C. 574 (11 S.E.2d 878). Under this rule, paragraph 78 was not subject to the special demurrer on this ground, since under all of the averments the last transaction set forth in that paragraph was such a part of the alleged original scheme, fraud, and constructive trust and *Page 156 
its development, and such a violation of the alleged previous promises and assurances of the defendant, as to bring the last transaction within the legal rule stated.
5. Where several persons conspire to defraud another, one or all of the wrong-doers may be sued, "proof of the conspiracy renders the act of one in deceiving and defrauding the injured party the act of all," and an implied or constructive trust may be set up as to the subject-matter of the fraud and conspiracy. Wall v. Wall, 176 Ga. 757 (1, 4, 5), 760-763 (168 S.E. 893), and cit. Since the petition sufficiently charged a conspiracy between the defendant and the two persons referred to in paragraph 3 above, to defraud the plaintiffs with respect to the last stock and bond transaction in question, there is no merit in the grounds of special demurrer to the petition as failing to allege that the defendant authorized the particular misrepresentations and the agreement of the alleged co-conspirators with the plaintiffs, or that such person had authority so to act for him. As to the last transaction, the petition was not subject to special demurrer as failing to allege whether the agreement of the alleged co-conspirators was in writing, since such agreement was not the basis of the alleged cause of action, and since the failure to allege that the agreement was in writing would not, in any event, render the petition demurrable, the silence of a pleader raising no presumption that a contract exists only in parol. Anderson v. Hilton Dodge Lumber Co., 121 Ga. 688, 690 (49 S.E. 725), and cit.; Ansley v. Hightower, 120 Ga. 719 (3) (48 S.E. 197); Mobley v. Lott, 127 Ga. 572 (2) (56 S.E. 637); Boney v. Cheshire, 147 Ga. 30
(2) (92 S.E. 636).
6. With respect to the first transaction, described in paragraph 3 supra, relating to the exchange of stocks between the alleged agent of the defendant and the plaintiffs, the averments were sufficient to charge agency and authority of the person so dealing with the plaintiffs, to act for the defendant.
7. The paragraphs attacked as failing to allege facts sufficient to show fraud, a constructive trust, or agency, and as irrelevant, immaterial, or stating mere conclusions, were not subject to these special grounds of demurrer, since the averments were pertinent to such questions, and, taken with other parts of the petition, sufficiently alleged the essential facts.
8. The statutory period of limitation in a suit for an accounting against an alleged trustee ex maleficio, and for establishment of an implied or constructive trust as to personal property, is ten years. This suit in equity for that relief having been brought within less than seven years from the accrual of a cause of action, and the averments showing no laches against the plaintiffs, such as would reduce the statutory period to a lesser period, for the reasons stated in the opinion the grounds of demurrer that the action was barred by the statute and by laches were properly overruled.
9. The court properly overruled the demurrer to the petition.
 No. 13643. MAY 15, 1941.
On March 12, 1940, Mrs. Mattie Elizabeth Hart, who had held in her name certain stocks and bonds, and others who claimed an interest therein under the will of her husband and other facts, filed this petition against Ed S. Grant. They seek to establish and enforce an alleged constructive trust as to such property, and pray for an accounting by the defendant for the proceeds and income if the stocks and bonds can be traced, and, if not, an accounting for an amount "at least equal to their market value at the time the defendant obtained them, plus interest at 7 per cent., . . so that petitioners have judgment . . in the sum of $6460, with interest thereon at the rate of 7 per cent. per annum until paid, from March 18, 1933, said interest amounting to $3517.86 at the time of filing this petition; and the additional sum of $11,898.70, with interest thereon at the rate of 7 per cent. per annum until paid, from March 20, 1933, . . amounting to $5811.86, . . the total amount of principal and interest . . at the time of filing this petition being $27,238.42." The essential averments are as follows: On March 18, 1933, Mrs. Hart "endorsed in blank and delivered to the defendant . . 20 shares of Georgia Power Company 6 per cent. preferred stock; 50 shares of Eagle 
Phoenix Mills of Columbus, Georgia; 10 shares of Thomaston Cotton Mills, Thomaston, Georgia, 6 per cent. preferred stock; 10 shares of American Bakeries stock; and 10 shares of Continental Gin Company of Birmingham, Alabama, preferred stock — all of the par value of $100 a share." When by this transfer the defendant "took legal title to said stocks . . he held same as constructive trustee thereof for the benefit of your petitioners," for the reasons then alleged. Said stocks were exchanged by Mrs. Hart for 325 shares of common stock of Progressive Insurance Company of Atlanta, Georgia, on March 18, 1933, in a transaction with P. Gilliland, by reason of her complete reliance on his representations to her that said insurance corporation stock "had paid . . and was paying dividends," and would pay a dividend on July 1, much greater than that on all the other stocks which petitioners thus swapped for that stock; that the insurance corporation stock had "a greater market value than the stock which petitioners were swapping for it;" that said corporation was doing business as a life insurance company; and that "some of petitioners' stocks were worthless, and . . the others would soon become worthless." *Page 158 
whereas, as Gilliland knew, said representations were false and said insurance corporation stock had never paid a dividend, was worthless, could not and was not going to pay a dividend on July 1, and "had no market value whatsoever;" said corporation "was not a life-insurance company and not engaged in the life-insurance business;" and petitioners' stocks had a market value of $6500, and were readily saleable on an established market. The plaintiffs, Amos A. Trotman and Mrs. Hart, who made the swap, "are ignorant farmers," living on farms about fifty miles from Columbus, Georgia, having only "a slight grammar-school education," being inexperienced in and unaccustomed to matters of business which had to do with other than sales and purchases of farm supplies and crops; and Mrs. Hart being physically and mentally ill at the time of said swap, and other swaps described in the petition, from the time of her husband's death in 1930; and petitioners did not know that said insurance corporation stock was valueless.
It was further alleged: Said "transfer and exchange of said . . insurance corporation common stock was a sale or exchange executed in behalf of the defendant" by said Gilliland; and he, "in executing said sale or trade of said securities, was acting in behalf of the defendant, and within the scope of his authority." The "defendant caused said stocks . . to be sold, and the proceeds of said sales have been unaccounted for by the defendant to petitioners, as it was his duty to do." Petitioners "do not know how much defendant obtained as proceeds, . . but charge that defendant did not receive less for said stocks than was their market value on the day legal title to same was acquired by the defendant from petitioners," and on said date the fair market value of said Georgia Power Company stock was $53 a share, a total of $1060, Eagle Phenix Mills stock $75 a share, total $3750, Thomaston Cotton Mills stock $30 a share, total $300, American Bakeries stock $90 a share, total $900, and Continental Gin Company stock $35 a share, total $350. The petitioners charge, that during said negotiations Gilliland, the defendant's agent, learned that petitioners owned 11 United States Government bonds of $1000 each; that a few days later, on March 20, 1933, after said first exchange, the defendant personally came to see petitioners, induced them to swap said bonds for 11 bonds of Fulton Industrial Securities Corporation for $1000 each, and completed this transfer *Page 159 
on April 20 and May 4, 1933; the Government bonds being transferred in blank and delivered to the defendant through Gilliland. his agent, and the exchange having been "executed by the defendant personally and . . said agent of defendant;" and that "when defendant took legal title to said United States Government bonds he held same as constructive trustee thereof," for reasons stated. "In order to induce your petitioner to make said swap, defendant represented to [them] that said Fulton Industrial Securities Corporation bonds had a greater market value than said United States Government bonds, that said . . Government bonds had gone down greatly in value, and were at that time selling on a market value less than par," whereas said United States bonds then had "the fair market value" of $11,898.70, and the Industrial Securities Corporation bonds "the fair market value" of $6270.00. The defendant knew such market value "was not in excess of said amount," and "knew . . said representations were untrue, and knew he was lying to induce your petitioners to part with said Government bonds; but petitioners "did not know that said representations . . were untrue, relied" thereon, and "as a consequence of said representations agreed to make said swap."
The petition alleged further assurances by the defendant: that he told them "he was a very wealthy man who had a large stock and bond business in Atlanta, and that he did not want to make any money off the petitioners, but was really interested in [their] welfare and wanted to assist [them] in realizing more money from the securities which [they] owned;" that "he had bought [said] Industrial Securities Corporation bonds and Progressive Insurance Holding Corporation stock for his own mother, and that petitioners could rely on him entirely when he stated to petitioners that said Progressive Insurance Holding Corporation stock and said . . Industrial Securities Corporation bonds were proper investments for petitioners, and of much greater value than the stocks and bonds previously owned by petitioner." "Defendant stated to your petitioners, . . he would look after all of petitioners' investments and could advise [them] when to sell the securities which he had traded them, and that they need look no further for advice or help to any one, but could always rely on him for direction and advice;" that "they could rely on him completely to handle their business affairs with reference to these securities, and that they *Page 160 
need have no fear for the safety or return of their investment in said . . stock and said . . bonds." The defendant caused the $11,000 of Fulton Industrial Securities Corporation bonds to be registered, $6000 in the name of the plaintiff Trotman, and $5000 in the name of Mrs. Hart, with the address of petitioners in care of the defendant's place of business. When petitioners did not receive a dividend, on July 1st, from the Progressive Insurance Holding Corporation stock, Mrs. Hart went to see the defendant at his office in Atlanta about September 1st. He then told her that said Insurance Corporation "was growing by leaps and bounds and would soon make [her] wealthy, and had not paid said dividend because it had needed said funds in its business, and that soon petitioner would receive an even greater dividend, . . and for [her] to go home and feel perfectly sure that her investment was safe and in good hands;" that she "should not discuss the matter with any one, and that he would see that she got her dividend;" that when she told the defendant "she thought she had better sell [said] stock, since it had not paid a dividend," he "told her she would be foolish to sell the stock at that time, as the stock would make her rich within a year or two, and would soon pay a much larger dividend." Mrs. Hart "thereupon went home and felt reassured by the talk with defendant, whom she still trusted and relied upon;" but when she afterwards repeatedly wrote to the defendant, requesting his help in getting her the promised dividend which she failed to receive, she had only one reply, a letter to her agent, referring him to the defendant's attorney.
The petition stated a further transaction around Christmas, 1933; that "J. O. Spaulding and W. E. Martin came to your petitioners' farms with the express purpose of swapping said Fulton Industrial Securities Corporation bonds for securities which they stated were safer, sounder, and paying large dividends," the "common stock of Pacific States Life Insurance Company;" that they told petitioners "said bonds were `loan-shark bonds' and . . the legislature was about to put the `loan-sharks' out of business and would ruin these bonds, and . . there was no time to lose in getting what petitioners could out of said bonds before they lost everything they had put in said bonds," and stated that "they were in a position to swap to petitioners 110 shares of the common stock of [said] insurance company," and "represented that said . . *Page 161 
insurance company stock was at that time on a dividend-paying basis, and that it had a greater market value than the . . Industrial Securities Corporation bonds;" that "said Spaulding and Martin knew . . your petitioners were ignorant and did not have the capacity or ability to see through their misrepresentations, and made every effort to obtain the confidence of said petitioners, which they completely attained," and petitioners "relied on the truthfulness of [said] representations;" but said "Spaulding and Martin knew that said representations were untrue, and knew that said stock . . was at that time valueless;" that "after several visits with said petitioners, said Spaulding and Martin obtained [their] complete confidence, . . and said petitioners agreed to swap their Fulton Industrial Securities Corporation bonds for 110 shares of [said] common stock," and on January 10, 1934, transferred said bonds to said Spaulding and Martin in blank, and delivered same to them along with said transfer," for which they caused 60 shares of said stock to be transferred to Trotman and 50 shares to Mrs. Hart, on January 22, 1934, and "as part of said swapping transaction" paid $305.70 to Trotman and $254.75 to Mrs. Hart, because they knew that petitioners desired to buy an automobile and needed that amount of money, and they agreed to pay such "money to further induce said petitioners to part with said valuable bonds in exchange for said valueless stock." It was then alleged, that "petitioners did not know that said cash money delivered to them really came from the proceeds of the sale of petitioners' own [Fulton Industrial Securities Corporation] bonds, and that such an inducement to make said swap was like giving a toy to a child in order to induce the child to be good and allay he child's suspicions;" that "at the time of said swap said . . bonds had a market value of $6,558.82," and Spaulding and Martin immediately sold said bonds for said amount through Fenner Beane, brokers.
The petition seeks to charge Grant with liability in this last transaction, by the following averments: that said acts and representations "were made . . to put into effect an agreement made between said Spaulding and Martin and the defendant before said Spaulding and Martin effected said swap," which agreement was that "defendant Grant would direct [them] to said petitioners, so that said Spaulding and Martin could trade petitioners out of said *Page 162 
. . Industrial Securities Corporation bonds;" that "in exchange for defendant Grant's co-operation . . by giving to said Spaulding and Martin the information of said petitioners' whereabouts and residence, and knowledge concerning said petitioners' ignorance and financial condition, commonly known as a `tip,' and in further consideration of Grant's assisting said Spaulding and Martin to dispose of said bonds, once they were procured from said petitioners, said Spaulding and Martin agreed to split said bonds or the proceeds thereof with defendant Grant," and he "was to receive in excess of 50 per cent. of said 11 . . bonds, or the proceeds of sale thereof;" that said Grant, "in furtherance of [said] scheme and agreement . . did undertake to assist and did assist said Spaulding to dispose of said bonds, or create a market therefore;" that "the real purchasers of said bonds were the defendant Grant or persons whom he or his agents procured to purchase said bonds," sold through said brokers; that said representations by Spaulding and Martin were "made in furtherance of said scheme and conspiracy between said parties, including defendant, and as such are chargeable to the defendant Grant;" that he "knew of the intention of said Spaulding and Martin to swap said worthless Pacific States Life Insurance Company stock to petitioners before said swap was made, and made no effort to warn petitioners of the valueless nature of said stock, in spite of his agreement and promise to advise petitioners with reference to disposing of said stock;" that "defendant, at the time he first made contacts with petitioners and learned that petitioners owned said [described] bonds and stocks, . . intended and schemed to defraud petitioners of all of said stocks and bonds," and "at the time defendant traded to petitioners said Fulton Industrial Securities Corporation bonds he never had any intention of leaving them with petitioners, but intended to take them away from petitioners through a fraudulent scheme at some propitious time thereafter," that "the subsequent fraudulent taking of said property by said Martin and Spaulding was merely a step in the whole scheme or transaction whereby petitioners were deprived of their stocks and bonds by said fraudulent scheming of the defendant." The petitioners charge that they were defrauded of their original stocks as of March 18, 1933, and of their Government bonds as of March 20, 1933, on which respective dates the market value of the stocks was $6460, and the market value of the bonds was $11,898.70. *Page 163 
Petitioners state that from the stock and bonds exchanged for their original securities they have received the following amounts: from stock of Progressive Insurance Holding Corporation, a liquidation dividend of $81.25, paid May 30, 1936, as a result of its receivership; from Fulton Industrial Securities Corporation bonds, at 7 per cent. per annum, $193.50 on May 1, 1933, $193.50 on August 1, 1933, and $193.50 on November 1, 1933, a total of $580.50; $560.45 paid on January 16, 1934, by Spaulding and Martin, as above stated; and that "petitioners did not know the fraud herein charged to defendant at the time they or either of them received said payments." It is further alleged, that in order to do equity the petitioners tendered back to the defendant $1755, representing all sums received by them through said transactions, plus 7 per cent. interest thereon from the dates received, and tendered back in kind said 325 shares of Progressive Insurance Holding Corporation stock, and said 110 shares of Pacific States Life Insurance Company stock, "said stock certificates at the time of said tender being properly endorsed by petitioners in blank," but that the defendant refused said tender, refused to account for the proceeds of said stocks and bonds, and denied any liability. In the petition they "continually tender to the defendant said stock certificates . . and said $1755, . . and state that they are agreeable that any decree or judgment . . against the defendant be conditional upon said payment and transfer by petitioners or offset in an amount equal to said $1755 and the transfer of said stock certificates or any other sums or property which this court may find due by petitioners to defendant."
The defendant assigns error on the overruling of his general and special demurrers on the grounds indicated in the syllabus.
Only the ruling in division 8 of the syllabus, relating to the statute of limitations and laches, requires elaboration. The Code, § 3-709, declares: "All actions against executors, administrators, guardians, or trustees, except on their bonds, shall be brought within 10 years after the right of action shall have accrued." In order for this period of limitations to apply, however, the trustee must by word or act hold adversely to his cestui que trust. This is true for the reason that as long as the trust is "subsisting," that is, where the trustee does not hold in his own *Page 164 
right but for the benefit of his cestui que trust, under the Code, § 3-713, the statutes of limitation would not apply, but in such cases recourse must be had to the equitable doctrine of laches. On the other hand, in cases of implied or constructive trusts, founded on fraud, "where the party claims title to the property in his own right, and is sought to be converted into a trustee by operation of law, the statute beings to run in his favor from the time of his possession, . . for the reason that his possession never was the possession of the alleged cestui que trust." Keaton v. Greenwood, 8 Ga. 97, 103. The same principle was expressed in Scott v. Haddock, 11 Ga. 258,264; Thomas v. Brinsfield, 7 Ga. 154, 158; Morgan v.Morgan, 10 Ga. 297, 306; Kane v. Bloodgood, 7 Johns. Ch. R. 111. Accordingly, as was held in Wylly v. Collins, 9 Ga. 223
(15), 242, "the statute of limitations applies to constructive trusts." In O'Neal v. O'Neal, 176 Ga. 418 (2, 3) (168 S.E. 262), after defining constructive trusts as those raised by equity in respect to property acquired by fraud, and after quoting the Code, § 3-709, which provides a ten-year limitation against "trustees" and other fiduciaries, "except on their bonds," it was held that this section "applies to constructive trusts." See Citizens Southern Bank v. Ellis,171 Ga. 717 (3), 733 (156 S.E. 603), in which it was held that "an action brought against trustees for accounting in equity must be brought within 10 years after the right of action accrues." These decisions, holding applicable the ten-year period of limitation fixed by the statute, control the instant suit, where the petition, brought within less than seven years from the date of the first transaction complained of, seeks to establish and enforce a constructive trust based on alleged fraud involving personalty received and held by the defendant adversely to the plaintiffs, and to have an accounting and recover its proceeds and income.
Cases applying a seven-year period of limitation to suits which sought to enforce an implied trust for recovery of land
seem to be based on a different rule, to wit, that an adverse holding for seven years under color of title will preclude its recovery, the same as in an action of ejectment. See, in this connection, Wallace v. Mize, 153 Ga. 374, 383
(112 S.E. 724); Stonecypher v. Coleman, 161 Ga. 403 (2), 411 (131 S.E. 75); Whittle v. Nottingham, 164 Ga. 155, 161
(138 S.E. 62); Eller v. McMillan, 174 Ga. 729 (2, 3), 733 (163 S.E. 910); Harris v. Neuman, 179 Ga. 879 (2), 883 (177 S.E. 698). *Page 165 
(a) However, the defendant insists that even though a period of limitations may have been fixed by statute, this time should be reduced by the equitable doctrine of laches (Code, §§ 3-712, 3-713, 37-119), and that the present suit is so debarred. As to the application of the equitable doctrine to reduce such a statutory period, if the facts and circumstances show laches, it was held in McDonald v. Sims, 3 Ga. 383, that "courts of equity usually act in obedience and in analogy to the statutes of limitations, in cases where it would not be unjust andinequitable to do so." (Italics ours.) On a petition to cancel deeds as a cloud on title to land, where by analogy a seven-year period of limitation was applied, this court held: "The true owner of land out of possession must seasonably apply to a court of equity for the cancellation of a deed alleged to be a cloud on his title, under which the person in possession claims title, and of which claim the true owner has notice, or he will be barred by his laches. But equity follows the analogy of the law, and will not close her doors to the complaint of the true owner . . when the complaint is made within a less time than that in which prescription could have ripened, and where no specialcircumstances appear demanding an earlier application." (Italics supplied.) Pierce v. Middle Georgia Land c. Co., 131 Ga. 99
(4), 103 (61 S.E. 1114). See Citizens Southern Bank v.Ellis, supra, which, like the instant case, involved enforcement of an implied trust with an accounting against trustees, and in which it was held that the suit, brought in eleven years after the right of action accrued, was barred both by the ten-year statutory period and by laches, three witnesses having become incapable of testifying, and an "ascertainment of the truth" having become "very doubtful, if not impossible." See also other cases following or holding to the same effect,Pierce v. Middle Ga. Land Co., supra, Stanley v. Reeves,149 Ga. 151 (2), 154 (99 S.E. 376); City of Barnesville v.Stafford, 161 Ga. 588 (3, d), 592 (131 S.E. 487); Morris
v. Morris, 76 Ga. 733 (3), 737. Accordingly, even though the ten-year period prescribed by the Code, § 3-709, was applicable to an alleged constructive trust of the character stated, involving personalty, this period would be reduced, if special circumstances were alleged, demanding an earlier application to a court of equity.
(b) As to what averments would be necessary to show such laches, the rule was stated in Citizens Southern Bank v.Ellis, *Page 166 
supra, as follows: "The delay must have been such as practically to preclude the court from arriving at a safe conclusion as to the truth of the matters in controversy, and thus make the doing of equity either doubtful or impossible, due to loss or obscuration of evidence of the transaction in issue, or where the lapse of time has been sufficient to create or justify a presumption against the existence or validity of the plaintiff's right, or to justify a presumption that, if the plaintiff was ever possessed of a right, it has been abandoned or waived, or has been satisfied." See, to like effect, Equitable Building Loan Asso. v. Brady, 171 Ga. 576 (2), 585 (156 S.E. 222);Griffin v. Haden, 172 Ga. 478 (2, a) (157 S.E. 686);Eller v. McMillan, supra.
Under the preceding holdings, and in the absence of averments bringing the petition within these rules as to laches, the action was not barred by lapse of less than seven years from the accrual of the cause. The court did not err in overruling the grounds of demurrer, raising the defense of the statute of limitations and laches.
Judgment affirmed. All the Justices concur.