Loulie Eugenia TARBUTTON, As Trustee, etc, Plaintiff and Third-Party Plaintiff in Counterclaim,

v.

ALL THAT TRACT OR PARCEL OF LAND KNOWN AS THE CARTER PLACE, LYING AND BEING IN the 98th GM DISTRICT, WASHINGTON COUNTY, GEORGIA, CONTAINING 585 ACRES, MORE OR LESS, etc; Blanche C. Holley, as Administratrix De Bonis Non of the Estate of Jeff Carter, deceased; Robert Lee Watkins, Individually and as Attorney-in-Fact for Timothy Dawson, et al.; and All The World, Defendants,

v.

Hugh M. TARBUTTON and Ben J. Tarbutton, Jr., Third-Party Defendants in Counterclaim,

Georgia Kaolin Company, Inc., Intervenor as Plaintiff and Defendant in Counterclaim.

Civ. A. No. 84–403–1–MAC.

United States District Court,
M.D. Georgia,
Macon Division.

Aug. 6, 1986.

Wallace Miller, Jr., Macon, Ga., D.E. McMaster, Sandersville, Ga., John B. Harris, Jr., Macon, Ga., for plaintiff and third party plaintiff in counterclaim.

Roger W. Moister, Jr., Atlanta, Ga., Terrell W. Benton, Jr., Athens, Ga., Charles M. Stapleton, Macon, Ga., Hamilton Lokey, Atlanta, Ga., for defendants.

FITZPATRICK, District Judge:

This is a diversity case, originally filed by plaintiff in April of 1984, in the Superior Court of Washington County, Georgia. Count one of the original complaint is a quiet title proceeding under Official Code of Georgia Annotated §§ 23–3–60 to –72 (Michie 1982), concerning approximately 585 acres of land in Washington County. Count two seeks damages for defamation of plaintiff's title. The named defendants are the heirs at law of Jeff Carter (hereinafter "Carter heirs"), with the exception of Robert Lee Watkins, the attorney-in-fact of said Carter heirs. Defendant Carter heirs filed responsive pleadings and counterclaimed for, *inter alia*, cancellation of the recorded deeds in plaintiff's chain of title and the imposition of a constructive trust in their favor. Plaintiff subsequently filed third-party complaints against her predecessor in title, Hugh M. Tarbutton, and his immediate predecessor, Ben J. Tarbutton, Jr., demanding judgment against them for any damages that might be adjudged against her in favor of defendant Carter heirs. The intervenor has a long term lease on the subject property.

Before the court are plaintiff's motion for summary judgment on count one of her complaint, in which motion the third-party defendants join, the third-party defendants' motion for summary judgment, in which they seek their dismissal as parties defendant in counterclaim, intervenor's motion for summary judgment respecting the relief sought in defendants' counterclaim, and defendants' motion for partial summary judgment respecting their counterclaim, specifically, the asserted one-eleventh interest of Esther Scott Hinton. Plaintiff's claims against defendant Robert Lee Watkins, individually, will not be dealt with herein. Suffice it to say that he has no interest in the real property which is the subject matter of this action.

The court has carefully considered the voluminous record in this case, including the pleadings, affidavits, exhibits, depositions, and briefs of the parties. Viewed in a light most favorable to the defendant Carter heirs, there is no genuine issue of material fact. The undisputed facts, set out below, lead to the conclusion that the plaintiff is entitled to judgment as a matter of law as to her title to the 585 acre tract of land.

## UNDISPUTED MATTERS OF FACT

The Carter heirs allege in their responsive pleadings and counterclaim that Jeff Carter died intestate January 24, 1930, in Washington County, Georgia, and that at the time of his death he owned the subject property in fee simple. At that time, it was described as three tracts of land: the Strange place, consisting of 100 acres, more or less; the Davis place, consisting of 200 acres, more or less; and the Jim Hooks place, consisting of 100 acres, more or less. Virge Carter, a son, qualified as Administrator of the Estate of Jeff Carter on May 5, 1930. On January 27, 1933, one E.N. Ennis acquired a deed to secure debt purportedly signed by Jeff Carter's heirs at law, securing a promissory note in the sum of $1,471.19. It is undisputed that one heir at law, Esther Carter Scott, now known as Esther Scott Hinton, did not sign the Ennis note and deed to secure debt. The Ennis deed to secure debt is recorded in deed book QQ, page 106, Clerk's Office, Washington County Superior Court. The deed

to secure debt and underlying promissory note were transferred and assigned by E.N. Ennis to Mrs. Fannie Belle Hatch by instrument dated March 2, 1936, recorded in deed book RR, page 203, Washington County records.

On June 1, 1936, Virge Carter died without completing administration of the Jeff Carter estate. At the July, 1936, Term, one Robert Hooks, Sr., was appointed administrator de bonis non of the estate. On December 6, 1937, Robert Hooks, Sr., was granted leave to sell 300 acres of land in the Estate of Jeff Carter, for the purpose of paying debts and making distributions to heirs.

Meanwhile, Mrs. Fannie Belle Hatch, holder of the Ennis deed to secure debt, advertised the subject property for foreclosure sale. On the first Tuesday in December, 1937, December 7, 1937, the subject property was sold at foreclosure sale by Mrs. Fannie Belle Hatch, as attorney-in-fact, to Mrs. Fannie Belle Hatch, the highest bidder for cash. The foreclosure deed is recorded at deed book TT, page 353, Washington County records.

On December 9, 1937, Mrs. Fannie Belle Hatch conveyed the property by warranty deed recorded at deed book TT, page 355, Washington County records, to Robert Hooks, Jr., for the stated consideration of $1,237.59. Mr. Hooks, Jr., in turn executed a deed to secure debt that date, to secure two promissory notes to Mrs. Hatch: one for $418.79, due November 1, 1938, and one for $418.80, due November 1, 1939. (This deed to secure debt has a satisfaction on the back of it dated April 12, 1940, signed by Mrs. Fannie Belle Hatch. The two promissory notes signed by Robert Hooks, Jr., have inscribed thereon in long hand: "Paid by B.J. Tarbutton, Apr. 13, 1940, Mrs. Fannie Belle Hatch by G.J. Elkins.")

The next recorded instrument in this chain of title is a warranty deed dated January 31, 1938, from Esther Scott to B.J. Tarbutton, reciting consideration of $1.00, and recorded in deed book TT, pages 545–546, Washington County Records, on March 30, 1938. This record of the deed was typewritten and shows only a notary public, Charles E. Williams, as a witness. However, the original of the deed actually has two witnesses: Charles E. Williams, Notary Public, and Maude Williams. This original was re-recorded January 21, 1984, at deed book 72, page 152, Clerk's Office, Washington County Superior Court. Robert Hooks, Jr., conveyed his interest in the described property to B.J. Tarbutton by warranty deed dated February 19, 1938, for the recited consideration of $640.00, and this deed is recorded in deed book TT, pages 546–547, Washington County records. Photocopies of the *original* instruments referred to thus far are appended to the affidavit of Hugh M. Tarbutton. Elsewhere in the record are certified copies of the recorded instruments.

It is appropriate to digress here and discuss the significance of the Esther Scott deed to B.J. Tarbutton. Esther Scott Hinton is the sole surviving child of Jeff Carter. In her deposition, she testified that she was born in Washington County, Georgia, May 7, 1914, and that her mother, Easter Gordy Carter, died while giving birth. Although Jeff Carter remarried before his death, he had no other children after Esther. She was raised primarily by her maternal grandmother and moved to Detroit, Michigan, around age five.

The Ennis note and deed to secure debt contained a blank line for the signature of "I.V. Scott." That would be Esther Scott, who married I.V. Scott in 1932, in Detroit. It is agreed that Esther Scott never signed the original Ennis deed to secure debt. When Mrs. Fannie Belle Hatch foreclosed upon the deed to secure debt, she could not have acquired Esther Scott's one-eleventh interest. Whether Esther Scott, now known as Esther Scott Hinton, signed the January 31, 1938, warranty deed to B.J. Tarbutton is very much in dispute. Esther Scott Hinton stated unequivocally in her deposition that she did not sign the instrument and that she had permanently settled in Los Angeles, California, in 1937, although the 1938 deed was purportedly executed in Detroit, Wayne County, Michigan.

The motions before the court can be decided without reaching the factual issues surrounding the Esther Scott deed, however.

Continuing with the recorded chain of title, B.J. Tarbutton executed a mineral lease dated December 7, 1950, to D.E. McMaster, recorded in deed book 5E, page 350, Washington County records, on August 10, 1968. D.E. McMaster, lessee, transferred this lease to Georgia Kaolin May 4, 1954. Although these and subsequent conveyances refer to 500 acres, more or less, or 585 acres, more or less, there is no question but that this is all the same property. Thereafter, B.J. Tarbutton conveyed this property to his two sons, Ben J. Tarbutton, Jr., and Hugh M. Tarbutton, by deed dated December 27, 1952, reciting as consideration his natural love and affection for his sons. This conveyance is also of record. B.J. Tarbutton died in September 1962. Ben J. Tarbutton, Jr., and Hugh M. Tarbutton divided their jointly held properties and Ben J. Tarbutton, Jr., conveyed this and others to Hugh M. Tarbutton by deed dated December 31, 1975, recorded January 23, 1976, in deed book 6C, page 764, Washington County records. On December 21, 1976, Hugh M. Tarbutton conveyed this property to plaintiff, Loulie Eugenia Kernaghan Tarbutton, as Trustee of Irrevocable Trust for Benefit of Loulie Eugenia Tarbutton (his daughter) under agreement with Hugh McMaster Tarbutton also dated December 21, 1976. This deed was recorded December 31, 1976, in book 6G, page 177, Clerk's Office, Washington County Superior Court.

This litigation was precipitated by the filing for record in the Clerk's Office, Washington County Superior Court, of two affidavits of defendant Robert Lee Watkins acting as attorney-in-fact for the Carter heirs: One dated December __, 1983, filed on January 25, 1984, and the second dated February 3, 1984. The latter affidavit had attached thereto a 190 page sworn statement of Robert Hooks, Jr. These affidavits and statements set forth the bases of the Carter heirs' claims to the land and concluded that title remains vested in the heirs at law of Jeff Carter. Because of the

cloud these documents placed on her title, plaintiff brought this action in April, 1984. She subsequently amended her complaint by adding as exhibits a surveyed plat of the property and photocopies of the nine recorded deeds constituting her chain of title, as well as the Georgia Kaolin mineral lease.

Plaintiff advances three methods by which she has obtained title to the subject property: her recorded chain of title beginning with the Ennis deed to secure debt that was foreclosed by Fannie Belle Hatch; prescriptive title by adverse possession for seven years under color of title, pursuant to O.C.G.A. §§ 44-5-161 and -164 (Michie 1982); and prescriptive title by adverse possession for twenty years, pursuant to O.C.G.A. §§ 44-5-161, -163 and -165 (Michie 1982). Plaintiff's answer to defendants' counterclaim also sets up laches and the statute of limitations as a defense to defendants' claims.

In their answer and counterclaim, defendants deny the claims of plaintiff and counterclaim that the Ennis deed to secure debt is void because it was not approved by the Probate Court (formerly Court of Ordinary) of Washington County, Georgia; that four of the signatures on the security deed were forgeries; that some of the signors on the deed to secure debt were minors; that Robert Hooks, Jr., received fee simple title as constructive trustee for the Jeff Carter estate, and that B.J. Tarbutton also took title as a constructive trustee, with the understanding he would hold the land in trust until the debts of the estate were paid; that the signature of Esther Scott on the January 31, 1938, deed to B.J. Tarbutton was a forgery; and that the sale by Robert Hooks, Jr., to B.J. Tarbutton was not authorized nor approved by the Probate Court and was void. The defendants further alleged in paragraph 29 of their counterclaim that:

B.J. Tarbutton, Sr. acquired title and possession to the land through actual and positive fraud in that he misrepresented to Robert Hooks, Sr. as Adminis-

trator of the Estate of Jeff Carter, Deceased and Robert Hooks, Jr. as constructive Trustee for said Estate, with the intent to deceive that he, B.J. Tarbutton, Sr. would take and hold legal title to the land and return it in the future to the Carter Heirs upon payment of all debts of the Estate while having the actual present knowledge and intent not to return the land, but to keep it for himself. Such misrepresentations were made knowingly and with the intent to deceive and were relied upon by Robert Hooks, Sr. as Administrator of the Estate of Jeff Carter, Deceased, and Robert Hooks, Jr., as constructive trustee of said Estate to their detriment and the detriment of the Estate of Jeff Carter, Deceased.

Defendants' evidence in opposition to plaintiff's and intervenor's summary judgment motions consists of affidavits and depositions of a few of the interested parties. Of course, this court may only consider evidence that will be admissible at trial. *Roucher v. Traders & General Ins. Co.*, 235 F.2d 423 (5th Cir.1956). Also, Georgia's witness competency rules apply. Fed.R.Evid. 601.

The court has reviewed this testimony and finds that much of it is either inadmissible as hearsay or incompetent under the Georgia dead man's statute, which provides in relevant part:

No person offered as a witness shall be excluded by reason of incapacity, for crime or interest or from being a party, from giving evidence, either in person or by deposition, according to the practice of the court, on the trial of any issue joined, or of any matter or question, or on any inquiry arising in any suit, action, or proceeding, civil or criminal, in any court or before any judge, jury, sheriff, coroner, magistrate, officer, or party having by law or consent of parties authority to hear, receive and examine evidence; but every person so offered shall be competent and compellable to give evidence on behalf of either or any of the parties to the said suit, action, or other proceeding, except as follows:

1. Where any suit shall be instituted or defended by a person insane at the time of trial, or by an indorsee, assignee, or transferee, or the personal representative of a deceased person, *the opposite party* shall not be admitted to testify in his own favor against the insane or deceased person as to transactions or communications with such insane or deceased person whether such transactions or communications were had by such insane or deceased person with the party testifying or with any other person.

. . . .

4. Where a person not a party, but *a person interested in the result of the suit,* shall be offered as a witness, he shall not be competent to testify, if as a party to the cause he would for any cause be incompetent.

Evidence Act of 1889, p. 89 (Ga. Code Ann. § 38–1603 (Harrison)) (emphasis added), *repealed by* 1979 Ga. Laws 1261 (concerning transactions which take place after July 1, 1979). A brief summary of the competent and admissible testimony of three of defendants' witnesses follows.

Mamie Carter was the wife of Virge Carter, the son of Jeff Carter who originally qualified as administrator of the estate. Virge Carter died June 1, 1936, and in February, 1937, Mrs. Carter and her young son, Virge Carter, Jr., moved to Brooklyn, New York, never to live in Sandersville again. Mrs. Carter testified that she and her son, along with a friend, drove down to Sandersville in 1955 to see B.J. Tarbutton. Mrs. Carter's testimony about what Mr. Tarbutton said and did is not admissible under the dead man's statute, but the essence of it is that Mr. Tarbutton said they owed three thousand dollars on the land, and Virge, Jr., pulled some money out of his pocket and Mr. Tarbutton said to wait, to come back in two or three years. Mrs. Carter never tried to get a lawyer to help them, although she testified that her son did.

Eloise Dawson Gordy was born in Sandersville September 27, 1929, and has resided there since. She is a child of Lora Ella

Carter Dawson, and a grandchild of Jeff Carter. She recalls working in the cotton fields on the Carter lands and going with her mother to take cotton to be ginned at the Tarbutton gin during the 1940's. (In fact, Mr. Tarbutton owned a cotton warehouse, not a gin.) She testified that her mother said that the cotton deliveries were payment on the debt to Mr. Tarbutton, and that on two or three occasions she was present when her mother asked for a receipt and received none. What her mother told her is clearly hearsay, but does explain the source of Mrs. Gordy's understanding that Mr. Tarbutton "took up a note" on the property. Mrs. Gordy testified she knows her mother and her aunt Lillie Turner from Philadelphia, Pennsylvania, went to talk to Mr. Tarbutton in the 1940's with three thousand dollars, but she did not go with them.

On cross-examination, Mrs. Gordy testified that several of the Carter heirs lived on the subject property during the 1940's, each responsible for his own acreage. Her family did not pay rent; they paid on the debt. She does not recall what arrangement the others had.

Mrs. Gordy had married and had moved perhaps a quarter mile away when her mother was thrown off the land by Sheriff A.W. Smith in 1950. She knows her mother contacted three different lawyers in the 1950's, to no avail. Lora Ella Dawson moved to Florida in 1951, and has since died.

Mrs. Gordy herself has made efforts to retain counsel to investigate the situation. When two explained that they could not help her, she arrived at the conclusion that no one wanted to go up against Mr. Tarbutton.

Mrs. Blanche C. Holley is currently administratrix de bonis non of the estate of Jeff Carter. She was born in 1920, and is the daughter of Lillian "Lillie" Carter Turner. She testified she remembers when Adam Renfroe came to Philadelphia in 1933 with a deed for her mother to sign, "to save the land." Mrs. Holley assumes this was the Ennis deed to secure debt, and

Mrs. Holley knows that the witness and notary public who appear on it were not present when her mother signed. She, Mrs. Holley, was present, though.

Mrs. Holley's testimony about events in Sandersville, Georgia, during the 1930's or 1940's, is hearsay. She was growing up in Philadelphia at the time. After her mother died in 1979, Mrs. Holley started talking to others about the property and what they could do to get it back.

Additional evidence upon which defendants rely will be discussed throughout this memorandum.

### RECORD TITLE OF PLAINTIFF

Plaintiff has established a complete chain of title by recorded deeds of conveyance beginning with the January 27, 1933, deed to secure debt to E.N. Ennis from all of the heirs at law of Jeff Carter except for Esther Scott, coupled with the 1938 warranty deed from Esther Scott, and ending with the deed to plaintiff as trustee in December, 1976. First of all, the court notes that under Georgia law, Jeff Carter's heirs at law had a right to mortgage the real property to E.N. Ennis. The Georgia Code provides:

(a) Upon the death of the owner of any estate in real property, which estate survives him *the title thereto shall vest immediately in his heirs at law,* subject to be administered by the legal representative, if there is one, for the payment of debts, the purposes of distribution, and other purposes provided for by law. If there is a legal representative, the right to recover the estate in real property shall be in him; if there is none, the heirs may bring an action in their own names.

(b) The title to all other property owned by a decedent shall vest in the administrator of his estate for the benefit of the heirs and creditors

O.C.G.A. § 53–4–8 (Michie 1982) (emphasis added).

Even assuming that Jeff Carter died owing debts, a conveyance by his heirs at law

would pass good title subject to the grantees being liable for the payment of such debts. "If the estate has been distributed to the heirs at law without notice of an existing debt, the creditors may compel them to contribute pro rata to the payment of his debt." O.C.G.A. § 53–7–95 (Michie 1982). *See also* Pindar, *Georgia Real Estate Law and Procedure*, § 15–73 (2d ed. 1979).

Plaintiff has made out a prima facie case upon her showing good record title for a period in excess of 40 years, O.C.G.A. § 44–2–22 (Michie 1982), and the defendants have presented no competent evidence to rebut the presumption of the validity or genuiness of any deed in her chain of title.

The deed from Esther Scott, as stated previously, has caused great difficulties for all the parties in this case. Early on in these proceedings, defendants produced as witness one Charles E. Williams of Taylor, Michigan, who alleged that he is the Charles E. Williams, Notary Public, who signed the Esther Scott deed as a witness in 1938 and that he did so at the behest of B.J. Tarbutton. In his deposition, taken August 8, 1985, Mr. Williams testified that he was born June 27, 1924, in Kentucky, and that he was residing with his family in Sandersville, Georgia, in 1938. He stated that he was mowing B.J. Tarbutton's yard one day when Mr. Tarbutton called him in and gave him five dollars to sign the document. Mr. Williams stated he was not a Michigan notary public at the time and further that neither the signature of Esther Scott nor the signature of the other witness, Maude Williams, were on the document, of which he saw only the second page. He further testified that only Mr. Tarbutton was present when he, Charles E. Williams, signed the document, that they were in the kitchen of the Tarbutton home, and that Mr. Tarbutton stamped the document with a rubber stamp afterwards.

The deposition of Charles E. Williams is replete with inconsistencies, to say the least, from other evidence in this case, including his own "Affidavit of Forgery" dated October 15, 1984, and filed for recording February 16, 1985, in the Clerk's Office of the Superior Court of Washington County. Although normally the question of credibility of a witness is for the fact finder, *King v. Ford Motor Co.*, 597 F.2d 436, 439 (5th Cir.1979), reasonable minds simply could not differ on the veracity of this witness in this case.

During the three or four year period of time Mr. Williams claims to have been residing in Sandersville with his parents and his younger sisters and brother, he would have been 13 or 14 to 16 or 17 years of age. The only person whose name he recalls is B.J. Tarbutton. He allegedly went to school there, but does not recall the name of the school or any of his teachers. He mowed the grass for several different people, but he recalls no one but Mr. Tarbutton. He does not recall where his father was working, or for whom, or why exactly they moved from Mayfield in Graves County, Kentucky, to Sandersville. He recalls nothing about the town itself—whether there was a movie theater or perhaps a river, or whether there was more than one school building. In short, he could specifically recall signing one piece of paper on one day in the summer of 1938 in Sandersville, Georgia, in the kitchen, (or office, according to his affidavit), of B.J. Tarbutton's home, and Mr. Tarbutton's stamping something on the document (or using a notary seal, according to his affidavit), but he has no memory of anything or anyone else during that period.

This incredible testimony is accompanied by Graves County, Kentucky, school records indicating that this same Charles E. Williams was enrolled in the Graves County School District in 1936, 1937, 1938, 1939 and 1940, moving from there to Detroit in 1941. The Washington County, Georgia, Board of Education, on the other hand, has no record of his, or his siblings, ever attending school there.

Finally, plaintiff has adduced proof of the existence of a Detroit attorney, Charles E. Williams, who was a Michigan notary during the 1930's, and who was married to one Maude Williams. Plaintiff's handwrit-

ing expert has concluded, and it has not been refuted, that the witness Maude Williams on the Esther Scott deed is the same person as the Maude Williams who married Charles E. Williams in Wayne County, Michigan, in 1931, and that the Charles E. Williams signatures on both the Esther Scott deed and a 1931 affidavit for a license to marry Maude Williams were written by one person. It is absolutely clear that Mr. Williams of Taylor, Michigan, is not the Charles E. Williams who signed the Esther Scott deed, and a reasonable mind could not believe otherwise.

■ Without the testimony of this Charles E. Williams, the only evidence of invalidity of the Esther Scott deed is the testimony of Esther Scott Hinton herself that she did not sign the deed. The findings of plaintiff's and defendants' handwriting experts were not conclusive. This is of no consequence because the doctrine of laches bars Esther Scott Hinton from now claiming, some *45 years* after the recording of a deed with her signature, that the signature is a forgery. The deed was filed for record in accordance with Georgia law, and filing is notice of the contents of the deed. O.C.G.A. § 44–2–1 (Michie 1982); *Gordon v. Georgia Kraft Co.*, 217 Ga. 500, 508, 123 S.E.2d 540, 545 (1962); *McElwaney v. MacDiarmid*, 131 Ga. 97(3), 62 S.E. 20 (1908). Possession of the subject property by B.J. Tarbutton, and his successors, as detailed within, was such that an interested party would be put on inquiry. "Notice sufficient to excite attention and put a party on inquiry shall be notice of everything to which it is afterwards found that such inquiry might have led." O.C.G.A. § 23–1–17 (Michie 1982).

" 'Fraud which must have been discovered if usual and reasonable diligence had been exercised, is not a good reply to the statute of limitations.' " *Slade v. Barber*, 200 Ga. 405, 410, 37 S.E.2d 143, 147 (1946) (citations omitted). " 'When a person is defrauded, and has knowledge of the fraud, the law expects him to ask redress, if at all, within the period of limitation. If he waits for a longer period, he is bound by

his laches.' " *Id.* 200 Ga. at 411, 37 S.E.2d at 147 (citations omitted). In the case at bar, the parties claiming fraud did not even initiate the action. All claims for redress are in their counterclaims.

Very close on point is the case of *Stephens v. Walker*, 193 Ga. 330, 18 S.E.2d 537 (1942). *Stephens* was an action brought in 1941 by an heir at law of a grandfather, to cancel the grandfather's deed on account of his alleged mental incapacity as grantor, and the grantee's alleged concealment of the execution of the deed. The deed was executed and recorded in 1927, and the grantee held under it until his death in 1941, after which it was held by the defendant as an heir at law. The court affirmed the dismissal of the action on the basis of both laches and the seven year statute of limitation, "where nothing is made to appear that the deed by the grandfather had been concealed, but on the contrary it was promptly recorded; and where the suit, instituted more than fourteen years after the execution of the deed and the death of the grantor, was not brought until after the death of the grantee...." *Id.* 193 Ga. at 333, 18 S.E.2d at 539.

For the foregoing reasons, defendants' summary judgment motion as to Esther Scott Hinton's one-eleventh interest must fail. Her claim is barred by the statute of limitations, and her laches, as a matter of law.

Assuming that the Esther Scott deed was forged, there is nothing in the record indicating that B.J. Tarbutton had knowledge thereof. Even a forged deed can serve as color of title, as next discussed.

### PLAINTIFF'S ADVERSE POSSESSION UNDER COLOR OF TITLE

Georgia law provides that possession of real property *under written evidence of title*, in conformance with Code section 44–5–161, for a period of seven years, confers good title, "provided that, if the written title is forged or fraudulent *and* if the person claiming adverse possession had actual notice of such forgery or fraud when he commenced his possession, no prescrip-

tion may be based on such possession." O.C.G.A. § 44–5–164 (Michie 1982) (emphasis added). Section 44–5–161 provides that in order for possession to be the foundation of prescriptive title, it: "(1) Must be in the right of the possessor and not of another; (2) Must not have originated in fraud except as provided in Code Section 44–5–162; (3) Must be public, continuous, exclusive, uninterrupted, and peaceable; and (4) Must be accompanied by a claim of right." O.C.G.A. § 44–5–161(a) (Michie 1982). Section 44–5–162 provides: "(a) In order for fraud to prevent the possession of property from being the foundation of prescription, such fraud must be actual or positive and not merely constructive or legal. (b) When actual or positive fraud prevents or deters another party from acting, prescription shall not run until such fraud is discovered." O.C.G.A. § 44–5–162 (Michie 1982).

Plaintiff's possession of the subject property, in her own right as trustee, commenced December 21, 1976. From that date forward she has been in continuous, exclusive, open and uninterrupted possession under claim of right. There is no contention that plaintiff had actual notice of forgery or fraud when she commenced her possession. Plaintiff's affidavit in support of her motion for summary judgment, and her deposition, both established that she has met the prerequisites for prescriptive title by adverse possession for seven years under color of title. Her deed was recorded in the public records in Washington County, Georgia, and she has since paid the ad valorem taxes on the property. No one other than plaintiff has been in possession of the property or any part of it, nor performed acts of dominion over the property since December 21, 1976, except with her permission and at her direction. The property has been supervised and maintained by a registered forester, with the cultivatable land planted in rows of trees, both prior to and since her acquisition of the property.

There is no shortage of case law on the subject of adverse possession and its elements. "The essence of actual possession is use of the land to such an extent and in such a manner as to put the world on notice." *Cheek v. Wainwright*, 246 Ga. 171, 173, 269 S.E.2d 443, 445 (1980). In this case, the Georgia Supreme Court held that planting trees in rows along a public road gives "clear and lasting notice that someone is exercising possession by even changing the nature of the real estate." *Id.*

■ "Peaceable possession" means possession unbroken by an ouster and is contradistinguished from disputed or hostile possession. *Poss v. Guy*, 212 Ga. 393, 395, 93 S.E.2d 565, 567 (1956).

> The term 'claim of right' is synonymous with 'claim of title' and 'claim of ownership.' ...
>
> ... Hostile possession or possession under a claim of right are, for all practical purposes, legal equivalents.... For the law will never construe a possession tortious, unless from necessity. On the other hand it will consider every possession lawful, the commencement and continuance of which is not proved to be wrongful. And this upon the plain principle that every man shall be presumed to act in obedience to his duty, until the contrary appears.

*Ewing v. Tanner*, 184 Ga. 773, 780–781, 193 S.E. 243, 247–248 (1937) (citations omitted). Additionally, possession is presumed to be adverse and in good faith, until the contrary is shown. *Gurr v. Gurr*, 198 Ga. 493, 502, 32 S.E.2d 507, 512 (1944).

■ Possession of property under a duly recorded warranty deed is notice to the world of the possessor's claim of title. *Poore v. Poore*, 210 Ga. 371, 372, 80 S.E.2d 294, 295 (1954). The recording of the 1976 deed into plaintiff, as well as the recording of the deeds in her chain of title beginning in 1938, constitutes the requisite notice of adverse possession of and in plaintiff and her predecessors. *Gordon v. Georgia Kraft Co.*, 217 Ga. 500, 123 S.E.2d 540 (1962), discussed this element of notoriety, pointing out that public recordation of a deed is adequate notice to a true owner as to invest constructive possession with "the

element of notoriety essential to its being adverse." *Id.* 217 Ga. at 508, 123 S.E.2d at 545 (citations omitted).

■ Even disregarding the prior deeds, plaintiff's deed was recorded December 31, 1976, and defendants' claims were barred after seven years, that is, on January 1, 1984.

■ Though it is not necessary for plaintiff to tack her possession onto that of her predecessors, the court notes that it is possible to tack the joint possession of Hugh M. Tarbutton and Ben J. Tarbutton, Jr., which began in 1952, continuing with the possession of Hugh M. Tarbutton, solely, to plaintiff's possession. It is not necessary for adverse possession to be maintained by the same person for the statutory period, provided there is continuity of the successive bona fide possessions, with the requisite privity existing so as to permit tacking of unbroken successive possessions. *Blalock v. Redwine*, 191 Ga. 169(2), 12 S.E.2d 639 (1940).

■ It would be appropriate at this juncture to discuss the effect of the alleged fraud on the part of B.J. Tarbutton in his acquisition of the subject property in 1938. In order to defeat title by prescription on the ground of fraud, it must appear that the fraud *of the prescriber* was such as to "charge his conscience," and thus amount to actual moral fraud. *Kelley v. Tucker*, 175 Ga. 796, 799, 166 S.E. 187, 189 (1932). "[T]he claimant's written evidence of title, under which he went into possession of the property, must be shown to have been fraudulent within his own knowledge, or notice thereof brought home to him before or at the time of the commencement of his possession." *Wingfield v. Virgin*, 51 Ga. 139(2) (1874). In the instant case, there is no evidence whatsoever that plaintiff, her grantor, or his predecessors, had knowledge of the alleged fraud of B.J. Tarbutton. And it has not been alleged that plaintiff, Hugh Tarbutton, or Ben Tarbutton, Jr., themselves, practiced any fraud. (Nor is there any competent evidence of fraud on the part of B.J. Tarbutton, Sr.).

## PLAINTIFF'S ADVERSE POSSESSION FOR TWENTY YEARS

The statutory authority for prescriptive title by twenty years' adverse possession is set forth in Official Code of Georgia Annotated § 44–5–161 (Michie 1982), quoted previously, and § 44–5–163, which states: "Possession of real property in conformance with the requirements of Code Section 44–5–161 for a period of 20 years shall confer good title by prescription to the property against everyone except the state and those persons laboring under the disabilities stated in Code Section 44–5–170." O.C.G.A. § 44–5–163 (Michie 1982). The plaintiff contends, and the court agrees, that since 1938, when B.J. Tarbutton took possession, until 1984, when defendants filed their counterclaim in this case, she and her predecessors in title have been in such adverse possession for 45 years so as to comply with the requisites of the law. Excluding the possession of B.J. Tarbutton, the only person alleged to have committed any wrongs, there remains over thirty years uninterrupted possession. Clearly, no heir at law of Jeff Carter has resided on the property, as a tenant or otherwise, since 1954, and perhaps as long ago as 1950.

Much of what has been discussed in reference to possession under color of title is also applicable here. During B.J. Tarbutton's ownership of the land, and while his sons, Ben J. Tarbutton, Jr., and Hugh M. Tarbutton, held the land jointly, the cultivatable portion of the land was cultivated by tenants, including some of the Carter heirs at law and Robert Hooks, Jr. Additionally, Georgia Kaolin paid annual rental for the clay lease. There has been exploration, prospecting and drilling of the lands by Georgia Kaolin, as lessee, the first time in 1950.

The subject property has been in the possession of tenants and lessees, as well as managed by a forester, for considerably longer than twenty years. "Possession need not be held, in person, by the one claiming prescriptive rights. 'He may hold

by a tenant. The tenant's possession is that of his landlord; and the landlord is the true possessor, within the meaning of [the prescription statute, O.C.G.A. § 44–5–161].'" *Swygert v. Roberts*, 136 Ga.App. 700, 222 S.E.2d 75, 76 (1975) (citations omitted).

■ Again the court notes that B.J. Tarbutton is the only person charged with fraud, and assuming arguendo he did commit fraud, that fraud is not fatal to adverse possession by his successors in title.

'The very object of the doctrine of prescription is to make a bad title good when the necessary requisites have been complied with.' ... 'When an adverse possessor has held for the requisite period and his prescriptive title ripens, it extinguishes all other inconsistent titles and itself becomes the true title.' ... 'When a party claims adversely, it is not necessary for him to show that he went into possession bona fide, but the burden of showing fraud is upon the opposite party.'

*Fraser v. Dolvin*, 199 Ga. 638, 640–641, 34 S.E.2d 875, 877 (1945) (citations omitted).

'It is not legal but moral fraud a consciousness of doing wrong, which, in the origin of the possession of land, prevents a prescription from running in favor of the possessor.' ... 'To defeat prescriptive title, *the fraud of the party claiming thereunder* must be such as to charge his conscience. He must be cognizant of the fraud, not by constructive but by actual notice.'

*Kelley v. Tucker*, 175 Ga. 796, 799, 166 S.E. 187, 189 (1932) (citations omitted) (emphasis added).

■ There is no evidence in this case indicating any knowledge of B.J. Tarbutton's alleged fraud on the part of his successors in title. At the earliest, Ben J. Tarbutton, Jr., and Hugh M. Tarbutton learned that the Carter heirs were interested in the property after B.J. Tarbutton died in 1962. Even assuming that at that time they learned their father had defrauded the Carters, this knowledge is not fatal to their title, which was acquired ten years earlier

in good faith. "If there was actual moral fraud on his part in staying in possession after becoming acquainted with the fact that his title was invalid, this would not defeat his prescriptive title, provided his original possession was in good faith." *Bower v. Cohen*, 126 Ga. 35, 41–42, 54 S.E. 918, 921 (1906). It is a question of law for the court whether the established and undisputed facts constitute adverse possession. *Lines v. State*, 245 Ga. 390, 396, 264 S.E.2d 891, 897 (1980); *Thompson v. Fouts*, 203 Ga. 522(2), 47 S.E.2d 571, 573 (1948). This court finds prescriptive title in plaintiff by adverse possession.

## THE IMPLIED OR CONSTRUCTIVE TRUST AND THE STATUTE OF LIMITATIONS

■ In their counterclaims, the defendant Carter heirs seek to impose and enforce an implied trust on the land in question and allege in support thereof that Mr. Tarbutton, Sr., took title from Robert Hooks, Jr., as a constructive trustee, with the understanding that he, B.J. Tarbutton, would hold the land until such time as the debts of the Jeff Carter estate were paid. Their evidence in this regard is primarily the affidavits and deposition of Robert Hooks, Jr., one of the handful of people still living who actually has first hand knowledge of the events which led to Mr. Tarbutton acquiring the property in 1938. Therefore, it would be appropriate to treat his evidence in some detail.

Robert Hooks, Jr., was born in Washington County, Georgia, in 1908. For the past fifty years he has lived across the public road from the subject property. Jeff Carter was Mr. Hooks' uncle, as a matter of fact.

During Mr. Hooks' deposition, defendants' counsel inquired about the foreclosure on the Carter property. Mr. Hooks testified: "They [the Carter's] had a debt to Mr. Ennis and he got a note and Virge [Carter] got Ms. Hatch and Mr. Elkins to get Ms. Hatch to take up this note, and Ms. Hatch wanted her rent for her money at

that time. She was requiring the interest for her money, and they didn't get it and they [Ms. Hatch] advertised the place to be sold." The Carters knew about the foreclosure and Robert Hooks, Sr., administrator of the estate at that time, knew about it. He unsuccessfully attempted to get power to sell part of the land to pay the debt. Mr. Hooks, Jr., a few days after the foreclosure sale, met with a group of the Carters and said that he would try to buy the property back for them. In fact, he successfully concluded the transaction with Mr. Elkins, brother and business manager of Mrs. Hatch, whereby he paid some cash down and gave Mrs. Hatch two notes secured by a deed to secure debt, and received a warranty deed for the property. Shortly thereafter, there were rumors that Mr. Hooks was taking the property for himself, so the Carter heirs at law sought someone else to "take it up." Mr. Luther Ennis and Rodell Carter ultimately went to B.J. Tarbutton, to whom the property was sold by Robert Hooks, Jr. According to Mr. Hooks, he understood at the closing of this sale that Mr. Tarbutton was going to hold the property for the Carter family for two years. Mr. Hooks referred to this as a two year option. In fact, at this same closing, at which the Carter heirs at law were represented by a son and a son-in-law, Mr. Hooks testified he asked for and received an oral option to follow the Carter option. Mr. Tarbutton said, "Well, if they don't pay it I'll let you have it back," according to Mr. Hooks. There was nothing in writing, however.

The consideration for the deed from Mr. Hooks to Mr. Tarbutton was $640, the cash Mr. Hooks had in the property, plus the assumption by Mr. Tarbutton of his indebtedness in favor of Mrs. Hatch.

During this period of time, Mr. Tarbutton was represented by attorney Jack Harris, whose law partner was David E. McMaster. Mr. McMaster was present, and witnessed and notarized the deed from Robert Hooks, Jr., to B.J. Tarbutton, but in his deposition he testified that he does not recall the details of the transaction, which would have been handled primarily by Mr. Harris.

In its motion for summary judgment, intervenor Georgia Kaolin frames the issue as what statute of limitations is applicable to impose and enforce implied trusts, and the effect of such limitation on the defendants' counterclaim.

A 1922 Georgia Supreme Court case succinctly set out the rules. The limitation period within which to enforce implied or constructive trusts is seven years from the time the cause of action accrues. So long as the constructive trustee acknowledges the trust, no cause of action accrues, and the limitation period does not begin. If the constructive trustee repudiates the trust, the cause of action accrues and the limitation period begins. The beneficiaries must bring an action within seven years or be barred. *Wallace v. Mize*, 153 Ga. 374, 383–84, 112 S.E. 724, 728–29 (1922).

In *Denson v. Denson*, 214 Ga. 8, 102 S.E.2d 605 (1958), plaintiffs alleged that their father fraudulently obtained quitclaim deeds from them in 1940 and 1942, by making oral promises which he did not intend to keep, to the effect that he would hold the property for plaintiffs during his lifetime, and that they would get their shares when he died. Plaintiffs sought to engraft an implied trust on these deeds and, to avoid the statute of limitations, plaintiff alleged that their father had treated the trust as subsisting. They filed the action within approximately two weeks of discovering that he had conveyed part of the property fourteen years earlier, by deed duly recorded in 1943. The sole issue was whether or not plaintiffs alleged any reason why the statute had not run. The court held that the recording of the deed was sufficient notice that the father was dealing with the property as his own, and the statute started running. *Id.* 214 Ga. at 11, 102 S.E.2d at 606. *Accord, Shepherd v. Frasier*, 223 Ga. 874, 159 S.E.2d 58 (1968).

The seven year statute of limitations is applicable to the instant case, and began to run when defendants actually or constructively learned that B.J. Tarbutton was

treating the property as his own, rather than as trustee. In their counterclaims, defendants allege that from 1938 until 1952, B.J. Tarbutton used the subject property for his personal use and gain by farming it and cutting timber from it. It is alleged that in 1948, Mr. Tarbutton refused a tender of three thousand dollars to free the land from the trust. In 1950, he executed a mineral lease in favor of D.E. McMaster, which lease (and assignment to Georgia Kaolin) were recorded in 1968. In 1952, B.J. Tarbutton conveyed the subject property to his sons, by duly recorded deed. This is the latest date the statute would have started to run.

The defendants claim that B.J. Tarbutton's actual and positive fraud in misrepresenting his intentions, *i.e.* his intention to keep the land for himself, tolled the running of the statute of limitations. In this regard, *Shipman v. Horizon Corp.*, 245 Ga. 808, 267 S.E.2d 244 (1980), is instructive. In *Shipman*, the Georgia Supreme Court addressed the precise issue before this court: When does fraud toll the statute of limitations? First, the court recognized that only actual fraud tolls the statute, and noted that actual and constructive fraud are defined in the Georgia Code as follows:

... (b) Actual fraud consists of any kind of artifice by which another is deceived. Constructive fraud consists of any act of omission or commission, contrary to legal or equitable duty, trust, or confidence justly reposed, which is contrary to good conscience and operated to the injury of another.

(c) Actual fraud implies moral guilt; constructive fraud may be consistent with innocence.

O.C.G.A. § 23-2-51 (Michie 1982).

The court further stated: "Actual fraud involves moral turpitude and has the effect of debarring and deterring the plaintiff from his action." 245 Ga. at 808, 267 S.E.2d at 245. Where actual fraud is the gravamen of the complaint, "the statute is tolled until the fraud is discovered or by reasonable diligence should have been dis-

covered." Where the gravamen of the action is constructive fraud, "there must be a separate independent actual fraud involving moral turpitude which debars and deters" the bringing of the action. *Id.* 245 Ga. at 808-09, 267 S.E.2d at 246.

Viewed in a light most favorable to the defendants, their allegations and supporting evidence at best involve only constructive fraud. Mr. Tarbutton breached an oral promise to hold the property for the benefit of the Carter heirs. There are no separate and independent acts of actual fraud involving moral turpitude which have prevented, debarred or deterred the defendants from bringing their action much more timely. There has been no concealment or trickery. From 1938 until 1952, when he conveyed the property, B.J. Tarbutton openly and conspicuously treated the property as his own.

The defendants' contention that B.J. Tarbutton failed to give written or oral notice to the Carter heirs at law that he was holding the property as his own is not supported in fact or law. The instances cited by defendants as occasions Mr. Tarbutton could have explained his position are predicated on hearsay, with one exception. That exception when they made cotton deliveries, Eloise Gordy's testimony about Mr. Tarbutton's unavailability, is innocuous. Furthermore, if "throwing Lora Ella Dawson off the property" in 1950 in itself did not raise a sound inference that B.J. Tarbutton was treating the land as his own, a registered letter, as suggested by defendants as more appropriate, would have been equally ineffective.

There is no legal excuse for defendants' forty-six year delay in asserting their claims. The court's cognizance of the general circumstances of uneducated, rural blacks in the 1930's and 1940's is simply not evidence that a white man, B.J. Tarbutton, utilized his stronger position to take advantage of the original Carter heirs at law. Neither they, nor he, remain to tell us their sides of this case. The jury questions defendants contend are raised by their evidence would not reach a jury because their

evidence is, predominantly, hearsay, incompetent, or both.

It is also noteworthy that the statute of frauds requires that an option to purchase real property be in writing, and also requires that a contract (option) not to be performed within a year be in writing. O.C.G.A. § 13–5–30(4) and (5) (Michie 1982). A recent Georgia case has held that where an agent's authority must be in writing, but it is not, misrepresentation of authority as a matter of fact cannot be actionable misrepresentation as a matter of law. *Walker v. Williams,* 177 Ga.App. 830, 833, 341 S.E.2d 487, 490 (1986). By analogy, defendants are barred from bringing an action for an oral misrepresentation, where the law requires that an option, to be enforceable, be in writing.

Finally, the court notes that even assuming that B.J. Tarbutton granted two valid and enforceable options to repurchase the land, Mr. Hooks' testimony is clear that he never attempted to exercise his option. "See, I didn't want to get in front of them [the Carter's], see." It is also clear that no one in the Carter family did anything *for several years* after the sale to Mr. Tarbutton. It has not been alleged, and there is no proof, that anyone tried to exercise any option during the first two years after the sale to B.J. Tarbutton.

### ADDITIONAL CONTENTIONS OF DEFENDANTS

■ As for any irregularities in the Ennis note and deed to secure debt, even assuming there were forged signatures (or improper attestation), nothing has been attributed to B.J. Tarbutton, and there is not even a hint that he had any connection with the 1933 security deed and/or the subsequent foreclosure by Mrs. Hatch in 1937. These charges by defendants are irrelevant, therefore, because adverse possession under color of title for seven years would make the "bad title good." *Lee v. Ogden,* 83 Ga. 325, 329, 10 S.E. 349, 350 (1889).

■ The defendants also seek an accounting from B.J. Tarbutton for all payments of money and crops by the Carter heirs, and a judgment for damages and waste. Assuming improper conduct on Mr. Tarbutton's part, the statute of limitations as well as laches bar the defendants' claim.

[E]quity will refuse relief 'to one whose long delay renders the ascertainment of the truth difficult....' An unreasonable delay until the death of essential witnesses, which practically precludes the court 'from arriving at a safe conclusion as to the truth of the matters in controversy,' and which 'makes the doing of equity either doubtful or impossible, due to loss or obscuration of evidence of the transaction in issue,' will bar the action.

*Stephens v. Walker,* 193 Ga. 330, 331, 18 S.E.2d 537, 538 (1942) (citations omitted).

### SUMMARY

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." This term, the Supreme Court reminded us that "there is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.... If the evidence is merely colorable, ... or is not significantly probative, ... summary judgment may be granted." *Anderson v. Liberty Lobby, Inc.,* —— U.S. ——, ——, 106 S.Ct. at 2505, 2511, 91 L.Ed.2d 202 (1986) (citations omitted).

In *Anderson v. Liberty Lobby, Inc.,* the Court also stated that while the movant has the burden of showing that there is no genuine issue of fact, the nonmovant is not relieved of the burden of producing evidence that would support a jury verdict. *Id.* —— U.S. at ——, 106 S.Ct. at 2514. Defendants' case is built on inferences and conjecture that B.J. Tarbutton misled or defrauded their family more than forty years ago. "The mere existence of a scintilla of evidence in support of [the nonmovant's] position [is] insufficient...." *Id.* at

———, 106 S.Ct. at 2512. *See also Kaye v. Pawnee Constr. Co.,* 680 F.2d 1360, 1364 (11th Cir.1982).

The Supreme Court has also addressed the issue of whether summary judgment is precluded where the moving party fails to support its motion with evidence negating the nonmovant's case. In *Celotex Corp. v. Catrett,* —— U.S. ——, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986), the Court explained that "the burden on the moving party may be discharged by 'showing' ... that there is an absence of evidence to support the nonmoving party's case," rather than producing evidence showing the "absence of a genuine issue of material fact, even with respect to an issue on which the nonmoving party bears the burden of proof." *Id.* —— U.S. at ——, 106 S.Ct. at 2554. This distinction is particularly noteworthy in the case at bar. Plaintiff and intervenor have clearly demonstrated that there is an absence of evidence to support defendants' case.

Additionally, laches and the applicable limitation periods preclude defendants from asserting their claims against the subject property. The plaintiff has established record title and prescriptive title as a matter of law. Accordingly, plaintiff's motion for summary judgment and intervenor's motion for summary judgment are GRANTED.